1   EDMUND G. BROWN JR.
    Attorney General of California
2   MICHAEL W. JORGENSON
    Supervising Deputy Attorney General
3   BRENDAN M. KENNY
    Deputy Attorney General
4   State Bar No. 237969
     455 Golden Gate Avenue, Suite 11000
5    San Francisco, CA  94102-7004
     Telephone:  (415) 703-5744
6    Fax:  (415) 703-5480
     E-mail:  Brendan.Kenny@doj.ca.gov
7
    Attorneys for Defendants McLean, Sayre, Rowe,
8   Horel, and Risenhoover

9

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                    SAN FRANCISCO DIVISION

13

14   **THOMAS GRAJEDA,**                  C 07-4752 PJH (PR)

15                        Plaintiff,      **DEFENDANTS' NOTICE OF MOTION
                                          AND MOTION FOR SUMMARY
16           v.                           JUDGMENT; MEMORANDUM OF
                                          POINTS AND AUTHORITIES**
17   **ROBERT A. HOREL, et al.,**

18                        Defendants.     **[No hearing per February 6, 2009 order of
19                                        service]**

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Memorandum of Points and Authorities ................................................................. 1

Statement of the Case ............................................................................................ 1

Issues Presented .................................................................................................... 2

Statement of Undisputed Facts .............................................................................. 3

      A.     Background regarding medical services. .................................... 3

      B.     Plaintiff's medical history. ......................................................... 5

      C.     Defendant Rowe's treatment of Plaintiff. .................................. 6

      D.     Defendants Risenhoover and Sayre's treatment of Plaintiff. ...... 9

      E.     Overview of Plaintiff's treatment. ............................................ 20

      F.     Plaintiff's government tort claim. ............................................. 23

Summary of Argument ........................................................................................... 23

Argument ............................................................................................................... 24

    I.     Plaintiff's Eighth Amendment claim for deliberate indifference against
defendants Rowe, Risenhoover, and Sayre should be dismissed because
they appropriately treated his complaints of weakness, fatigue, headaches,
back pain, knee pain, and hip pain. ............................................................ 24

      A.     Legal standard for summary judgment. ................................... 24

      B.     Defendants Rowe, Risenhoover, and Sayre were not deliberately
indifferent because they exhaustively addressed Plaintiff's
numerous complaints. .............................................................. 24

    II.    Defendants are entitled to qualified immunity. .......................................... 29

      A.     Defendants did not violate Plaintiff's constitutional rights. ..................... 30

      B.     Defendants acted reasonably based on clearly established law. .............. 30

    III.   Plaintiff did not plead medical malpractice in his California tort claim. ............. 31

    IV.   The medical malpractice claim against Defendants Sayre and Risenhoover
must be dismissed because their medical decisions were dictated by the
standard of care. ....................................................................................... 32

Conclusion ............................................................................................................. 33

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

Anderson v. Liberty Lobby, Inc.
477 U.S. 242 (1986)................................................................................................ 24

Beard v. Banks
548 U.S. 521 (2006)................................................................................................ 24

Belle v. Stampler, et al.
No. CV 04-298 TUC (DCB), 2006 WL 3792038 (D. Ariz. Dec. 21, 2006)............... 26, 27, 32

Broughton v. Cutter
622 F.2d 458 (9th Cir. 1980).................................................................................. 25

Bucquet v. Livingston
57 Cal. App. 3d 914 (Ct. App. 1976)...................................................................... 31

Celotex Corp. v. Catrett
477 U.S. 317 (1986)................................................................................................ 23

Esposito v. Khatri, et al.
No. 08-cv-742-H, 2009 WL 702218 (S.D. Cal. Mar. 16, 2009).............................. 26, 27

Estate of Ford
301 F.3d 1043 (9th Cir. 2002)................................................................................ 29

Estelle v. Gamble
429 U.S. 97 (1976)................................................................................................. 24

Farmer v. Brennan
511 U.S. 825 (1994)............................................................................................... 24, 25

Franklin v. State of Oregon, State Welfare Division
662 F.2d 1337 (9th Cir. 1981)................................................................................ 25

Harlow v. Fitzgerald
457 U.S. 800 (1982)............................................................................................... 28, 29

Hunter v. Bryant
502 U.S. 224 (1991)............................................................................................... 28, 29

Hutchinson v. United States
838 F.2d 390 (1988)............................................................................................... 25

ii

# TABLE OF AUTHORITIES
### (continued)

Page

*Jackson v. McIntosh*
    90 F.3d 330 (9th Cir. 1996) ...........................................................................................25

*Jeffers v. Gomez*
    267 F.3d 895 (9th Cir. 2001) ..........................................................................................29

*Martinez v. Woodford*
    No. C 05-1150 MHP, 2006 WL 2038490 (N.D. Cal. July 20, 2006) ...............................26, 27

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
    475 U.S. 574 (1986)........................................................................................................24

*McGuckin v. Smith*
    974 F.2d 1050 (9th Cir. 1992) *overruled on other grounds by WMX Techs., Inc. v.*
    *Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc) .........................................................24

*Mitchell v. Forsyth*
    472 U.S. 511 (1985)........................................................................................................29

*Pearson v. Callahan*
    129 S. Ct. 808 (2009)..................................................................................................29, 30

*Roberts v. Spalding*
    783 F.2d 867 (9th Cir.1986) ...........................................................................................25

*Sanchez v. Vild*
    891 F.2d 240 (9th Cir. 1989) ..........................................................................................25

*Saucier v. Katz*
    533 U.S. 194 (2001).....................................................................................................29, 30

*Shapley v. Nev. Bd. of State Prison Comm'rs*
    766 F.2d 404 (9th Cir.1985) ...........................................................................................25

*Stockett v. Association of Cal. Water Agencies Joint Powers Ins. Auth.*
    34 Cal. 4th 441 (2004) ....................................................................................................31

*Thomas v. California Dep't of Corr.*
    No. 1:06-cv-00104-LJO-WMW, 2009 WL 691986 (E.D. Cal. Mar. 16, 2009).....................26

*Watson v. California*
    21 Cal. App. 4th 836 (Ct. App. 1993) .............................................................................31

*Wood v. Housewright*
    900 F.2d 1332 (9th Cir.1990) ......................................................................................25, 28

iii

# TABLE OF AUTHORITIES
### (continued)

**Page**

STATUTES

42 U.S.C. § 1983......................................................................................................1, 2, 25

42 U.S.C. § 1997e(c)(1)........................................................................................................1

California Government Code
    §§ 905, 905.2, 945.4 .......................................................................................................31

CONSTITUTIONAL PROVISIONS

United States Constitution

Eighth Amendment...................................................................................1, 2, 23 passim

COURT RULES

Federal Rules of Civil Procedure
    Rule 56...........................................................................................................................1
    Rule 56(c) ....................................................................................................................23
    Rule 56(e) ....................................................................................................................24


OTHER AUTHORITIES

California Code Regulations, Title 15
    § 3350(a) ..........................................................................................................3, 31, 32
    § 3350(b)(1) ....................................................................................................................4

iv

1    TO THOMAS GRANDE GRAJEDA, PRO SE:

2    PLEASE TAKE NOTICE that Defendants McLean, Sayre, Rowe, Horel, and Risenhoover

3    (Defendants) move this Court for summary judgment under Federal Rule of Civil Procedure 56

4    on the grounds that there are no genuine issues of material fact, that Defendants are entitled to

5    judgment as a matter of law, and that Defendants are entitled to qualified immunity.

6    This motion is based on this notice of motion and motion, the accompanying memorandum

7    of points and authorities, the declarations of L. Rowe, S. Risenhoover, M. Sayre, and Brendan

8    Kenny, the request for judicial notice, and all pleadings, exhibits, and papers on file in this action,

9    and any other matters properly before this Court.

10                    **MEMORANDUM OF POINTS AND AUTHORITIES**

11

12                              **STATEMENT OF THE CASE**

13    Plaintiff Thomas Grande Grajeda (Plaintiff), a state prisoner incarcerated at Pelican Bay

14    State Prison, filed this civil action on September 14, 2007.  Plaintiff's filed his Complaint *pro se*

15    under 42 U.S.C. § 1983 against Pelican Bay employees, including the Warden, medical providers,

16    and prison administrators.  (Court Docket No. 1.)  As required by 42 U.S.C. § 1997e(c)(1), the

17    Court screened Plaintiff's Complaint, dismissing the Complaint with leave to amend.  (Court

18    Docket No. 2.)

19    On January 11, 2008, Plaintiff filed an amended Complaint.[1]  The Court screened Plaintiff's

20    Complaint.  (Order of Service, February 25, 2008.)  The Court determined that Plaintiff stated

21    cognizable claims under § 1983 for deliberate indifference to Plaintiff's serious medical needs in

22    violation of the Eighth Amendment by: (1) Defendant Rowe for allegedly failing to treat

23    Plaintiff's anemia for fourteen months; (2) Defendants Sayre and Risenhoover for discontinuing

24    Plaintiff's permission for a cane and knee brace;[2] (3) Defendant Sayre for refusing to examine

25    Plaintiff on one occasion; (4) Defendant McLean because she was informed of his need for

26    _____

27    [1] All further references to Plaintiff's Complaint are to the amended Complaint.
     [2] Although the Court refers to a leg brace, the record reflects that medical providers

28    discontinued Plaintiff's permission for a knee brace.

                                              1

1   medical care but failed to ensure that he received it; and (5) Defendant Horel because he allowed

2   medical providers to confiscate Plaintiff's cane and knee brace and oversaw an inadequate

3   medical care system. (Order of Service 2:11–27, February 25, 2008.) And the Court determined

4   that Plaintiff stated a cognizable claim against Defendants Sayre and Risenhoover for medical

5   malpractice. (*Id.* 2:22–25.) The Court ordered service upon Defendants McLean, Sayre, Rowe,

6   Horel, and Risenhoover. (*Id.* 3:6–7.)

7           On August 1, 2008, Defendants McLean, Sayre, Rowe, Horel, and Risenhoover filed a

8   motion to dismiss arguing that all of Plaintiff's § 1983 claims, except for those alleging deliberate

9   indifference to medical needs against Defendants Sayre and Risenhoover for confiscating the

10  cane and knee brace, must be dismissed due to Plaintiff's failure to exhaust his administrative

11  remedies before filing suit. (Defs.' Mot. Dismiss 13–16.) Defendants also argued that Plaintiff

12  failed to state any claim upon which relief could be granted (*id.* 17–21), that Defendants are

13  entitled to qualified immunity (*id.* 21–23), that Plaintiff's claims for equitable relief were barred

14  by pending class action lawsuits (*id.* 23–24), and that Plaintiff cannot recover punitive damages

15  against Defendants in their official capacity. (*Id.* 24.)

16          In its February 6, 2009 Order, the Court granted Defendants' motion in part, dismissing

17  without prejudice Plaintiff's § 1983 claims against Defendant Sayre for refusing to examine him

18  on one occasion and Defendant McLean because she was informed of his need for medical care

19  but failed to ensure that he received it. (Order Granting Defs.' Mot. Dismiss 4:4–5:12.) The

20  Court also dismissed the § 1983 claim against Defendant Horel, (*id.* 5 fn. 2) and the official

21  capacity claims against Defendants, which also precluded punitive damages. (*Id.* 9:17–19.) This

22  left deliberate indifference claims against Defendant Rowe for allegedly failing to treat Plaintiff's

23  anemia for fourteen months, and Defendants Sayre and Risenhoover for discontinuing Plaintiff's

24  permission for a cane and knee brace, as well as a claim for medical malpractice.

25                                  **ISSUES PRESENTED**

26      1.   A disagreement with medical providers' medical judgment does not establish

27  deliberate indifference to medical needs in violation of the Eighth Amendment. Is summary

28  judgment proper on Plaintiff's deliberate indifference claims against Defendant Rowe for not

                                         2

1  treating anemia, and Defendants Risenhoover and Sayre for discontinuing Plaintiff's permission

2  for a cane and knee brace, if they conducted numerous examinations and prescribed numerous

3  medications, ordered diagnostic tests, and referred Plaintiff to specialists and for physical therapy

4  sessions, all based on the exercise of their medical judgment and Pelican Bay regulations?

5       2.    Are Defendants entitled to qualified immunity on Plaintiff's deliberate indifference

6  claim when their actions did not violate a constitutional right and when it would not have been

7  clear to a reasonable medical provider that they violated Plaintiff's constitutional rights?

8       3.    The California Tort Claims Act requires that a plaintiff present a claim to a public

9  entity before suing the entity or its employees.  The plaintiff's claims in each cause of action must

10  be fairly reflected in a tort claim filed with the public entity.  Should Plaintiff's cause of action for

11  medical malpractice be dismissed if he did not allege medical malpractice in the tort claim, and

12  therefore did not allege the legal theory supporting the cause of action in his tort claim?

13       4.    To establish a prima facie cause of action for medical malpractice, a plaintiff must

14  prove that a defendant's conduct breached the standard of care.  Did Defendants Sayre and

15  Risenhoover act within the standard of care if they conducted numerous examinations and

16  prescribed numerous medications, ordered diagnostic tests, and referred Plaintiff to specialists

17  and for physical therapy sessions, all based on the exercise of their medical judgment and Pelican

18  Bay regulations?

19                         **STATEMENT OF UNDISPUTED FACTS**

20  **A.    Background Regarding Medical Services.**

21       1.    California Code of Regulations, title 15, section 3350(a) states that medical providers

22  may only order medical services "based on medical necessity and supported by outcome data as

23  effective medical care.  In the absence of available outcome data for a specific case, treatment

24  will be based on the judgment of the physician that the treatment is considered effective for the

25  purpose intended and is supported by diagnostic information and consultations with appropriate

26  specialists.

27       2.    "Medically Necessary means health care services that are determined by the attending

28  physician to be reasonable and necessary to protect life, prevent significant illness or disability, or

                                             3

---

1    alleviate severe pain, and are supported by health outcome data as being effective medical care."

2    Cal. Code Regs. tit. 15, § 3350(b)(1).

3        3.    "Outcome Study means the definition, collection and analysis of comparable data,

4    based on variations in treatment, concerning patient health assessment for purposes of improving

5    outcomes and identifying cost-effective alternatives." *Id.* § 3350(b)(2).

6        4.    "Outcome Data mean statistics such as diagnoses, procedures, discharge status, length

7    of hospital stay, morbidity and mortality of patients, that are collected and evaluated using

8    science-based methodologies and expert clinical judgment for purposes of outcome studies." *Id.*

9    § 3350(b)(3).

10       5.    "Severe pain means a degree of discomfort that significantly disables the patient from

11   reasonable independent function." *Id.* § 3350(b)(4).

12       6.    "Significant illness and disability means any medical condition that causes or may

13   cause if left untreated a severe limitation of function or ability to perform the daily activities of

14   life or that may cause premature death." *Id.* § 3350(b)(5).

15       7.    Pelican Bay's medical policy contained in Chapter 3 entitled "Health Care Services

16   Requests Policies and Procedure," and dated May 26, 2004, requires that inmates request medical

17   services by submitting a medical services request form.  Medical providers gather these forms

18   each day and review them.  They are treated as confidential, legal documents.  (Risenhoover

19   Decl. Ex. A, AGO-0378.)

20       8.    Pelican Bay's medical policy contained in Chapter 18a, entitled "Medical Chrono

21   Policy and Procedure," and dated July 22, 2002, states that a particular modification of custody

22   regulations requires a primary care provider's request, and then the Chief Medical Officer's (or

23   someone he designates) approval.  (Risenhoover Decl. Ex. B, AGO-0382.)

24   //

25   //

26   //

27

28

4

9. Chapter 18a also provides that inmates only receive canes and knee braces if they have one or more of the following documented medical conditions:[3] (1) disability that significantly restricts movement; (2) documented severe cardiopulmonary disease; (3) severe chronic pain condition; (4) severe peripheral vascular disease; (5) severe lower extremity edema; and (6) acute injury. (Risenhoover Decl. Ex. B, AGO-0384.)

10. When a primary care provider believes that some service is medically indicated that is not provided at Pelican Bay he or she submits a Physician Request for Services form. Pelican Bay's Utilization Management nurse reviews the form. The Utilization Management nurse determines whether to approve or deny the request based on an established set of medical criteria. If the nurse is unsure of whether to approve or deny the request, it is reviewed by Chief Medical Officer Dr. Sayre at the Second Level. If he is unsure whether to approve or deny the request, he will send it to the Medical Advisory Review committee for a Third Level of review. (Rowe Decl. ¶ 7; Kenny Decl. Ex. A, AGO-0006–0008.)

**B.    Plaintiff's Medical History.**

11. Plaintiff, a fifty-seven year old male, has been incarcerated at Pelican Bay since June 29, 2004. (Compl. ¶ 15; see Kenny Decl. Ex. A, AGO-0008.) He was convicted for solicitation of murder in December 2003, and is serving a twenty-five-year-to-life term. (Req. Judicial Notice.)

12. On February 4, 2003, Plaintiff was involved in a vehicle accident while at California State Prison, Corcoran. (Compl. ¶ 13.) Plaintiff alleges that he suffered serious injuries to his face, forehead, right knee, and fractured his right hip. (Id.)

13. Corcoran medical providers ordered several diagnostic tests, including an x-ray of Plaintiff's pelvis, an x-ray of Plaintiff's hip, and Computed Tomography (CT) scans of Plaintiff's sinuses and brain. They also referred him for three orthopedic consultations. Plaintiff also

---

[3] This particular section of Chapter 18a also refers to other medical devices for other medical conditions, such as C-PAP/BIPAP and oxygen for sleep apnea. (See http://en.wikipedia.org/wiki/Positive_airway_pressure) (last accessed on May 7, 2009) ("Positive airway pressure (PAP) is a method of respiratory ventilation used primarily in the treatment of sleep apnea . . . .").)

5

1   received extensive medical care at University Medical Center in 2003.  (Sayre Decl. ¶ 33.)

2        14.   On June 29, 2004, Plaintiff transferred to Pelican Bay.  (Compl. ¶ 15.)

3        **C.   Defendant Rowe's Treatment of Plaintiff.**

4        15.   In February 2005, Plaintiff was seen by Dr. Gregory Duncan for an orthopedic

5   consultation.  During that examination, Dr. Duncan noted that Plaintiff's right hip had restricted

6   range of motion which caused pain in the area between the right thigh and right knee.  In addition,

7   he noted that x-rays of the right hip indicated "an old trauma to the inferior femoral head area

8   with some post-traumatic degenerative changes."  Finally, he noted that there was some

9   tenderness in the right knee, but that the x-rays were unremarkable.  He recommended referral to

10   a neurologist "to determine if there are any denervation changes or other objective evidence to

11   support referred pain from the back into the right leg area." (Sayre Decl. ¶ 5.)

12        16.   In March 2005, Dr. Maukonen performed an Electromyogram (EMG), nerve

13   conduction studies, and physically examined Plaintiff.  An EMG measures the electrical activity

14   of muscles at rest and during contraction.  Nerve conduction studies measure how well and how

15   fast the nerves can send electrical signals.  He noted that Plaintiff used a cane and had a slight

16   limp on his right side.  He also noted that EMGs showed a loss of nerve connection below the

17   right knee, but no other abnormalities.  He recommended a MRI of Plaintiff's lower back.  He

18   also recommended Neurontin for pain if the MRI did not show a proximal lesion.  (*Id.* ¶ 6.)

19        17.   In March, Dr. Duncan again examined Plaintiff.  Dr. Duncan noted: "[g]iven the

20   improvement in his physical exam today compared to his last examination I would be

21   reluctant to recommend any invasive treatment at this time but epidural steroids would be an

22   option if symptoms were to reoccur."  (*Id.* ¶ 7.)

23        18.   At Dr. Duncan's request, the Pelican Bay clinic took an x-ray of Plaintiff's lumbar

24   spine.  The radiologist determined that the lumbar spine looked essentially normal, with "no

25   fractures or significant arthritic changes."  (*Id.* ¶ 8.)

26        19.   In May, the radiology lab at Sutter Coast Hospital conducted a MRI of Plaintiff's

27   lumbar spine.  The MRI showed a mild disc bulge in the spine, but no evidence of a herniated

28   disc or nerve denervation.  The bones that form the spine in the back are cushioned by small,

6

1    spongy discs. When these discs are healthy, they act as shock absorbers for the spine and keep

2    the spine flexible. But a damaged disc may bulge or break open. This is called a herniated disc.

3    It may be caused by the wear and tear that occurs with age or by a spine injury. Nerve

4    denervation occurs when there is a loss of nerve connection to an area, such as the lumbar spine.

5    (Sayre Decl. ¶ 9.)

6        20.   In August, Dr. Duncan again examined Plaintiff. Dr. Duncan noted full range of

7    motion in Plaintiff's right knee. An x-ray of the right knee showed normal alignment and bone

8    structure. He recommended physical therapy for Plaintiff's back and right knee. (*Id.* ¶ 10.)

9        21.   In August, at Dr. Duncan's request, the Pelican Bay clinic took an x-ray of Plaintiff's

10   right knee. The radiologist determined that the x-ray was unremarkable. (Sayre Decl. ¶ 11.)

11       22.   In August and September, Plaintiff attended physical therapy sessions with Patrick

12   Dodgen. (Sayre Decl.¶ 12; Kenny Decl. Ex. A, AGO-0356–0357.)

13       23.   On October 20, 2005, Defendant Rowe examined Plaintiff for his complaints of

14   chronic headaches. He stated that he had a history of facial reconstruction. He also complained

15   that he experienced dizzy spells if he got up too soon. He complained that Neurontin and the

16   other pain medication he received did not work. She asked him if he was Hepatitis C positive.

17   He stated that he was, but that he had not had a blood test lately. She informed him that a blood

18   test was done in March 2005 which indicated that Plaintiff was not Hepatitis C positive. Plaintiff

19   then became very annoyed and abruptly ended the visit by leaving the room. (Rowe Decl. ¶ 4;

20   Kenny Decl. Ex. A, AGO-0001–0002.)

21       24.   For some time prior to December 2005, Plaintiff took Neurontin. Neurontin is an

22   FDA-approved oral medication for the treatment of partial seizures in adults and children. It is

23   also FDA-approved for management of the loss of sensation following Herpes. Neurontin is not

24   FDA-approved for treatment of chronic pain and headaches. Neurontin produces psychoactive

25   effects that create a danger that it will be used recreationally, particularly in a correctional setting.

26   Commonly accepted treatments for generalized chronic pain and headaches are prescriptions of

27   non-steroidal anti-inflammatory drugs (NSAIDs) such as Aspirin, Amoxiprin, Ibuprofen,

28   Naprosyn, Tylenol, and Salsalate. (Sayre Decl. ¶ 14; Rowe Decl. ¶ 13.)

7

25.   On December 5, 2005, Defendant Rowe examined Plaintiff as a follow-up from orthopedic surgeon Dr. Duncan's November examination of Plaintiff.  Before seeing Plaintiff, she reviewed Dr. Duncan's analysis of Plaintiff's complaints of low back and right leg pain.  Dr. Duncan recommended that Plaintiff receive epidural steroid injections.  (Sayre Decl. ¶ 13; Rowe Decl. ¶ 5; Kenny Decl. Ex. A, AGO-0004–0005, 0013–0014.)

26.   Epidural steroid injections (ESIs) are a common treatment for many forms of low back pain and leg pain.  The goal of the injection is pain relief.  While the effects of the injection tend to be temporary—providing relief from pain for one week up to one year—an epidural can be very beneficial for a patient during an acute episode of back and/or leg pain.  Importantly, an injection can provide sufficient pain relief to allow a patient to progress with a rehabilitative stretching and exercise program.  (Rowe Decl. ¶ 6.)

27.   During the visit, Plaintiff requested that Defendant Rowe reorder the Neurontin and other medications.  She did so, and also requested that Plaintiff receive steroid injections.  (Rowe Decl. ¶ 7; Kenny Decl. Ex. A, AGO-0006–0008.)  She submitted the request based on Dr. Duncan's recommendation.  She also thought that it might address some of Plaintiff's complaints of back and right leg pain.  (Rowe Decl. ¶ 8.)

28.   On December 17, 2005, Defendant Rowe gave Plaintiff permission to wear a wool knit cap for one year based on his complaints of increased headaches during cold weather caused by the plate in his head.  (Rowe Decl. ¶ 9; Kenny Decl. Ex. A, AGO-0011.)

29.   On January 8, 2006, Plaintiff submitted a health care request to RN L. Bree.  He stated: "Dr. L. Rowe renewed my medication for my headaches and pain, yet I only received my medication for a few weeks.  I am in constant pain and the Neurontin helps ease the migraine headaches."  He also asked to see a doctor.  (Rowe Decl. ¶ 10; Kenny Decl. Ex. A, AGO-0017.)

30.   On January 9, RN Bree interviewed and assessed Plaintiff.  She noted that Plaintiff stated during the October 20 visit with Dr. Rowe that Neurontin did not help his headaches, but now claimed that it did.  She scheduled Plaintiff to be seen by a doctor to explain why the Neurontin was discontinued.  (Rowe Decl. ¶ 11; Kenny Decl. Ex. A, AGO-0018–0019.)

//

8

31. On January 13, Plaintiff received an epidural steroid injection at Sutter Coast Hospital. (Rowe Decl. ¶ 12; Kenny Decl. Ex. A, AGO-0020–0025.)

32. On January 20, Defendant Rowe examined Plaintiff. Plaintiff asked why the Neurontin was discontinued and stated it was the only thing that has helped with his headaches. He stated that he had daily headaches since a 2003 accident. Defendant Rowe informed Plaintiff that Neurontin is not medically indicated for headaches. He requested other pain medication. She ordered Tylenol, and instructed Plaintiff not to overuse it. (Rowe Decl. ¶ 13; Kenny Decl. Ex. A, AGO-0026–0028.)

33. That same day, Defendant Rowe requested an outside consultation for Plaintiff's stated pain. She did so based on Plaintiff's complaints of daily headaches, that the plate placed in his head after his 2003 reconstructive surgery contributed to his headaches, and that Tylenol and other pain medications were ineffective. (Rowe Decl. ¶ 14; Kenny Decl. Ex. A, AGO-0029.) The Medical Advisory Review (MAR) committee denied the request because it was not medically indicated. Specifically, Dr. Maukonen's previous examinations revealed no significant neurological abnormalities. (Sayre Decl. ¶ 15.)

34. Other than refilling his prescriptions, and the last time she did so was April 24, 2006, Defendant Rowe has not treated Plaintiff since January 20, 2006. (Rowe Decl. ¶ 15.)

**D. Defendants Risenhoover and Sayre's Treatment of Plaintiff.**

35. Although Defendant Risenhoover does not have an independent recollection of how long she has treated Plaintiff, Plaintiff's medical records indicate that she began reviewing his laboratory tests on February 21, 2006, refilling his medication in March 2006, and individually treating him in May 2006. (Risenhoover Decl. ¶ 2.)

36. On February 21, 2006, Defendant Risenhoover reviewed the results of Plaintiff's total iron-binding capacity test. This test measures the maximum amount of iron that a patient's blood can carry. Medical providers order this test for patients whom they suspect have iron deficiency and/or anemia. The higher the iron-binding capacity is, the greater the likelihood of iron deficiency and/or anemia. Plaintiff's test indicated an above-average iron-binding capacity. (Risenhoover Decl. ¶ 4; Kenny Decl. Ex. A, AGO-0038.)

9

Defs.' Not. Mot. & Mot. Summ. J.; Mem. P & A

*Grajeda v. Horel, et al.*
C 07-4752-PJH (PR)

37.    On April 13, Dr. Emani examined Plaintiff. Plaintiff was very angry that the Medical Advisory Review (MAR) Committee denied his request for a neurological consultation. He stated that the epidural injections did not help. Dr. Enami stated that he would bring Plaintiff's request to the MAR committee again. Dr. Enami asked about Plaintiff's symptoms, but Plaintiff became increasingly agitated and used profanities. As a result, correctional officers removed Plaintiff from the room before Dr. Enami could complete the examination. (Risenhoover Decl. ¶ 5; Kenny Decl. Ex. A, AGO-0046.)

38.    Between January and May 2006, Dr. Rowe, Ms. Risenhoover, and other medical providers appropriately treated Plaintiff's complaints of pain with NSAIDs. (Sayre Decl. ¶ 16; Kenny Decl. Ex. A, AGO-0026–0051.)

39.    On May 1, Defendant Risenhoover examined Plaintiff. Based on Plaintiff's prior complaints of diarrhea, she ordered hemoccult fecal blood test cards. These test stools for blood. She wanted to rule out fecal bleeding, since this can indicate colorectal cancer. She ordered Prilosec for the day after the fecal blood test, and ordered ferrous sulfate and vitamin C for ninety days after the test. (Risenhoover Decl. ¶ 6; Kenny Decl. Ex. A, AGO-0052.)

40.    Prilosec can help alleviate heartburn, which Plaintiff complained of earlier. Ferrous sulfate is used to treat iron deficiency, which was suggested by Plaintiff's prior complaints of dizziness and fatigue. Vitamin C deficiency was suggested by Plaintiff's prior complaints of dizziness and fatigue. She also referred Plaintiff for an Esophagogastroduodenoscopy (EGD) based on his reported history of iron deficiency and his recorded iron-binding capacity. An EGD is a diagnostic endoscopic procedure that visualizes the upper part of the gastrointestinal tract. She renewed Plaintiff's permission for a neoprene sleeve for the right knee. A neoprene sleeve gently compresses the area around the knee and improves neuromuscular control. She scheduled Plaintiff to return in seven days to follow-up the MAR committee's review of his treatment. (Risenhoover Decl. ¶ 7.)

41.    On May 1, after reviewing Plaintiff's medical file, including x-rays and an MRI of Plaintiff's back, the MAR discontinued Plaintiff's permission to have a cane, knee brace, and

10

1    waist chain cuffs because they were not medically indicated.  The MAR committee also

2    determined that Plaintiff's request for a neurological consultation was not medically indicated.

3    And the MAR recommended Elavil for Plaintiff's complaints of pain.  (Risenhoover Decl. ¶ 8;

4    Sayre Decl. ¶ 8.)

5         42.    Elavil is in a class of medications called tricyclic antidepressants, and is generally

6    prescribed to treat symptoms of depression.  Although its common use is for treatment of

7    depression symptoms, including sleeplessness, in small doses (such as 10 to 50 mg daily) it can

8    act as an analgesic and ease the effects of conditions such as chronic headaches and generalized

9    chronic pain.  Defendant Sayre prescribed Elavil after reviewing Plaintiff's request for pain

10   medicine.  The medical records reflect that Plaintiff refused to take it.  (Sayre Decl. ¶ 9.)

11        43.    That same day, Defendant Risenhoover interviewed Plaintiff in response to his inmate

12   appeal PBSP-06-00709.  Plaintiff stated that he would wait until the MAR committee decided

13   whether to send him to a neurologist.  He then stated that the interview was over, and walked out

14   of the room.  As he did so, he stated: "if you want the cane, you will have to come and take it

15   from me.  I am done."  (Risenhoover Decl. ¶ 9.)

16        44.    On May 3 and May 5, Pelican Bay employees observed Plaintiff walking smoothly

17   without a cane or a knee brace, and without favoring his left or right side.  (*Id.* ¶ 10.)

18        45.    On May 5, Defendant Risenhoover again interviewed Plaintiff in response to his

19   inmate appeal PBSP-06-00709.  She informed him that the MAR committee reviewed an MRI

20   and x-rays of his back and recommended Elavil for his complaints of pain, and determined that he

21   did not need a cane or a knee brace.[4]  Plaintiff stated in response to the Elavil recommendation

22   that "I am not taking any psych med." On that basis, she discontinued Elavil.  She also informed

23   him that Pelican Bay employees had observed him on two occasions walking smoothly without a

24   cane or a knee brace, and without favoring his left or right side.  She requested a non-metallic

25   right knee sleeve for Plaintiff.  (*Id.* ¶ 11.)

26   _____

27        [4] Although the inmate appeal PBSP-06-00709 response reflects that the MAR committee
     discontinued Plaintiff's permission to have a knee sleeve, the knee sleeve was never confiscated.
28   (Risenhoover Decl. ¶ 11.)

                                        11

46.   On May 11, Defendant Risenhoover reviewed the results of the fecal blood test.  They indicated that Plaintiff had no fecal bleeding.  (Risenhoover Decl. ¶ 12; Kenny Decl. Ex. A, AGO-0057.)

47.   On June 5, Defendant Risenhoover requested that an outside specialist perform an EDG and Colonoscopy on Plaintiff due to his history of iron deficiency and his complaints of chronic mid-abdominal pain.  (Risenhooover Decl. ¶ 13.)

48.   On June 6, Defendant Risenhoover examined Plaintiff in response to his inmate appeal PBSP-06-01027.  Prior to the examination, she reviewed x-rays and Drs. Duncan and Maukonen's analyses of Plaintiff's right leg and lower back, as well as Patrick Dodgen's physical therapy notes from September 20, 2005.  She ordered Myoflex for Plaintiff's complaints of pain, Mylanta for Plaintiff's complaints of stomach discomfort, and ferrous sulfate to address the iron-deficiency anemia.  (Id. ¶ 14.)  Myoflex is a topical pain reliever.  It works by reducing swelling and inflammation in muscle and joints.  (Sayre Decl. ¶ 18.)  Plaintiff stated that he wanted an alternative to Elavil, because he would not take "psychotic" medication.  He also requested physical therapy sessions.  She advised Plaintiff to avoid strenuously exercising his back and right knee and also increase stretches and warm-ups before exercising.  She requested Plaintiff's referral to physical therapy sessions and a non-metallic knee sleeve to strengthen his knee.  (Risenhoover Decl. ¶ 14; Kenny Decl. Ex. A, AGO-0060–0065.)

49.   On June 22, RN J. Flowers examined Plaintiff.  RN Flowers noted Plaintiff's complaint that the ferrous sulfate he took with meals was causing heartburn, he had acid reflux when lying down, and that he often rested with his legs and feet elevated.  RN Flowers informed Plaintiff that ferrous sulfate usually does not cause acid reflux, but that he should take ferrous sulfate between meals with juice or water, not with milk.  RN Flowers also informed Plaintiff that elevating his legs may increase his headaches.  RN Flowers also scheduled Plaintiff for a doctor's appointment.  (Risenhoover Decl. ¶ 15; Kenny Decl. Ex. A, AGO-0067–0068.)

50.   On July 11, Dr. Nguyen examined Plaintiff in preparation for an EDG and Colonoscopy.  He diagnosed Plaintiff with anemia and a history of peptic ulcer disease.  (Risenhoover Decl. ¶ 16; Kenny Decl. Ex. A, AGO-0073–0074.)

12

51. On July 19, Defendant Risenhoover examined Plaintiff. Before examining him, she reviewed his medical records, including Dr. Nguyen's chart from his July 11 examination. Plaintiff wanted her to give him permission to wear wool caps for another year, and reorder iron supplements and vitamin C. She reordered ferrous sulfate, Prilosec, and vitamin C. She stated that she would look into the knee sleeve and make sure the MAR committee considered Plaintiff's request for wool caps. She scheduled Plaintiff to return in thirty days to follow-up on physical therapy and the EDG and Colonoscopy. (Risenhoover Decl. ¶ 17; Kenny Decl. Ex. A, AGO-0075–0083.)

52. On August 3, Defendant Risenhoover examined Plaintiff. Before the examination, she reviewed Plaintiff's medical records, including the July 25, 2006 iron-binding capacity test, which showed a decrease in Plaintiff's iron-binding capacity. He stated that his knee still hurt, he had not yet received the non-metallic right knee sleeve, had not received a wool cap, and he had diarrhea. She informed Plaintiff that a wool cap was not medically indicated. He stated that he would "take it up with Dr. Sayre." She rescheduled Plaintiff for follow-up in fourteen days for his complaints of diarrhea, and told him to tell medical staff if he continued to have problems. She advised him to avoid strenuous exercise, drink more water, and avoid alcohol and caffeine. (Risenhoover Decl. ¶ 18; Kenny Decl. Ex. A, AGO-0090–0095.)

53. On August 10, Defendant Sayre requested Plaintiff's temporary transfer to Sutter Community Hospital for an EDG and Colonoscopy. On August 14, Dr. Nguyen performed the EDG and Colonoscopy. Dr. Nguyen recommended that Plaintiff take Nexium once a day while awaiting the results of the biopsies. The same day, Dr. Williams ordered Prilosec for Plaintiff. (Risenhoover Decl. ¶ 19; Kenny Decl. Ex. A, AGO-0098–0106.)

54. On August 21, Defendant Risenhoover examined Plaintiff as a follow-up to the EDG and Colonoscopy. He stated that Prilosec hurt his stomach, so she discontinued it. Plaintiff also stated that it may have been Plaintiff's twin brother, not Plaintiff, walking without a cane, and that he wanted the cane back. She ordered Nexium per Dr. Nguyen's recommendation. Nexium is used to treat symptoms of gastro esophageal reflux disease (GERD) and other conditions involving excessive stomach acid, and is also used to heal the damage to the esophagus caused by

13

1   stomach acid. She scheduled Plaintiff for follow-up in thirty days regarding the status of his

2   anemia. She ordered Tylenol to address Plaintiff's complaints of pain. (Risenhoover Decl. ¶ 21;

3   Kenny Decl. Ex. A, AGO-0112–0115.)

4        55.   On August 30, Defendant Risenhoover examined Plaintiff. Plaintiff stated that he had

5   not yet received a knee brace and that he wanted a MRI of his knee. To address his complaints of

6   diarrhea, she ordered fiber tablets. She also considered whether a bacterium was causing the

7   diarrhea. Plaintiff stated that he felt much better since taking iron supplements, and she ordered

8   comprehensive tests to measure Plaintiff's current iron levels. She rescheduled Plaintiff for

9   follow-up in fourteen days regarding the diarrhea. (Risenhoover Decl. ¶ 22; Kenny Decl. Ex. A,

10   AGO-0117–0119.)

11       56.   Defendant Sayre examined Plaintiff on August 30, 2006, in response to his inmate

12   appeal PBSP-06-01925. Specifically, in response to Plaintiff's claim that the metal plates in his

13   head were affected by the cold weather and his request for wool caps to keep his head warm.

14   Defendant Sayre did not see a need for the wool caps because the plates were: (1) too low to be

15   covered by a wool cap; (2) internal and kept at the same temperature as the interior of Plaintiff's

16   skull by the rich blood supply to the scalp; and (3) not affected by external temperature. In any

17   event, it would not get cold enough in Plaintiff's cell to require a wool cap. (Sayre Decl. ¶ 19;

18   Kenny Decl. Ex. A, AGO-0120.)

19       57.   Between May and August 2006, Defendant Risenhoover and other medical providers

20   appropriately treated Plaintiff's iron deficiency anemia and complaints of diarrhea with

21   medication, numerous tests, referral to an outside specialist for review, and an

22   Esophagogastroduodenoscopy (EGD) and Colonoscopy. They appropriately treated his

23   complaints of pain by sending him to physical therapy sessions with Patrick Dogden, providing

24   him with a non-metallic right knee sleeve, proposing Elavil, and prescribing him Myoflex crème.

25   (Sayre Decl. ¶ 18; Kenny Decl. Ex. A, AGO-0052–0119.)

26       58.   On September 22, Defendant Risenhoover examined Plaintiff to follow-up on his

27   diarrhea. He stated that the fiber tablets helped with the diarrhea. He also stated that his back

28   was stiff and his pain from the headaches was a four on a scale of one to ten. He complained that

14

1    he was cold. She ordered Naprosyn to address Plaintiff's complaints of pain. Naprosyn is a non-

2    steroidal anti-inflammatory drug (NSAID) commonly used for the reduction of moderate to

3    severe pain, fever, inflammation, and stiffness caused by conditions such as osteoarthritis,

4    rheumatoid arthritis, and degenerative disc disease. She gave Plaintiff permission to have an

5    extra blanket. She directed medical staff to take Plaintiff's blood pressure once a week and to

6    notify her if his blood pressure was above 140 over 90. She advised Plaintiff to avoid caffeine

7    and alcohol. (Risenhoover Decl. ¶ 23; Kenny Decl. Ex. A, AGO-0131–0132.)

8       59.   On October 2, Defendant Risenhoover examined Plaintiff in response to his inmate

9    appeal PBSP-06-02193. Plaintiff stated that he had gone to physical therapy, but that it was for

10    his right knee. He wanted physical therapy for his right hip. Plaintiff also stated that Naprosyn

11    and Tylenol did not help. She discontinued the Naprosyn and ordered Salsalate. Salsalate is a

12    NSAID effective in treating fever, pain, and inflammation in the body. Salsalate is also used for

13    the treatment of inflammation and pain of soft tissue injuries, tendinitis, and other related arthritis

14    conditions. She requested that the MAR committee review Plaintiff's requests for an MRI of his

15    right knee and pain management changes. She rescheduled Plaintiff for follow-up in thirty days.

16    (Risenhoover Decl. ¶ 24; Kenny Decl. Ex. A, AGO-0134–0138.)

17       60.   On October 13, the Pelican Bay radiologist analyzed an x-ray of Plaintiff's right hip

18    taken on October 3. He concluded that there was only a mild degeneration of Plaintiff's arthritic

19    condition since July 2004. (Risenhoover Decl. ¶ 25.) The radiologist noted "[m]ild interval

20    progression of degenerative arthritic change involving the right hip when compared with the

21    previous study in July 2004" as well as "minimal arthritic changes involving the sacroiliac joints

22    also noted, otherwise negative." (Sayre Decl. ¶ 20; Kenny Decl. Ex. A, AGO-0142.) The

23    sacroiliac joint is the joint at the base of the spine. Inflammation of this joint is one cause of low

24    back pain. In other words, there was no major change in Plaintiff's condition over more than two

25    years that would cause an increase in pain, and therefore Plaintiff's medical providers did not

26    need to change Plaintiff's treatment plan. (Sayre Decl. ¶ 20.)

27       61.   On October 20, Defendant Risenhoover examined Plaintiff. He stated that his back

28    had "popped" earlier but that the pain had subsided. He stated that Dr. Nguyen had not examined

15

1    him since the EDG and Colonoscopy on August 14. Defendant Risenhoover left a message with

2    the Pelican Bay specialty clinic requesting that they schedule Plaintiff for a follow-up

3    appointment with Dr. Nguyen. Defendant Risenhoover reordered Salsalate and instructed

4    Plaintiff to avoid strenuous exercise and recommended stretching and warm-ups before

5    exercising. (Risenhoover Decl. ¶ 26; Kenny Decl. Ex. A, AGO-0143–0144.)

6    62.   In October, the MAR committee considered Plaintiff's request for wool caps and also

7    found they were not medically indicated. (Sayre Decl. ¶ 20.)

8    63.   On November 13, Defendant Risenhoover examined Plaintiff. He disagreed with the

9    MAR committee's decisions that an MRI of his right knee, wool caps, and a cane were not

10   medically indicated. Plaintiff stated that he had a non-metallic knee sleeve. He reported that the

11   diarrhea was gone. He stated that he no longer wanted to take Salsalate. Plaintiff stated that he

12   would give her copies of orthopedic consultations performed while Plaintiff was at Corcoran

13   State Prison. She discontinued the Salsalate and reordered the other prescriptions. She

14   rescheduled Plaintiff for follow-up in sixty days. (Risenhoover Decl. ¶ 27; Kenny Decl. Ex. A,

15   AGO-0154–0158.)

16   64.   On December 22, Defendant Risenhoover examined Plaintiff. He stated that his

17   headaches were no better and his knee was getting worse. He stated that the other pain

18   medications had not worked, but that he would still not take Elavil. She noted that test results

19   indicated that Plaintiff's anemia had resolved. After the visit, she reviewed Plaintiff's case with

20   Dr. Sayre based on Plaintiff's complaints of right knee pain, right hip pain, and headaches. As a

21   result of that examination and review of Plaintiff's medical records, Dr. Sayre recommended that

22   Plaintiff attend physical therapy sessions. Physical therapy sessions teach pain-decreasing

23   exercises and how to avoid activities that increase pain and wear and tear on the affected area.

24   The many useful stretching and strength-building techniques taught during physical therapy

25   sessions can be used after the physical therapy sessions are discontinued. The same day,

26   Defendant Risenhoover submitted the request. (Sayre Decl. ¶ 21; Risenhoover Decl. ¶ 28; Kenny

27   Decl. Ex. A, AGO-0172–0175.)

28   //

16

1      65.    On January 24, 2007, Defendant Risenhoover examined Plaintiff in response to an

2    inmate appeal.  He asked for an MRI of his right knee, right hip, and a CT scan to identify the

3    cause of his headaches.  A CT scan is a type of x-ray that uses a computer to interpret and display

4    images.  He claimed that his right hip was getting worse, and asked for a cane.  He stated that he

5    did not want pain medication because none of it worked.  Later that day, she reviewed the

6    orthopedic consultations performed while Plaintiff was at Corcoran.  There was nothing in these

7    consultations to indicate that she should alter Plaintiff's treatment plan.  (Risenhoover Decl. ¶ 29;

8    Kenny Decl. Ex. A, AGO-0177–0180.)

9      66.    On February 28, Defendant Risenhoover examined Plaintiff as a follow-up after his

10    discharge from physical therapy on January 23 and her December 22 referral to the MAR

11    committee.  He stated that he did not want pain medication because it did not help.  He stated that

12    he needed the non-metallic knee sleeve.  She explained that it was not medically indicated at this

13    time.  She rescheduled Plaintiff for follow-up in thirty days.  She also ordered an x-ray taken of

14    Plaintiff's right knee.  (Risenhoover Decl. ¶ 30; Kenny Decl. Ex. A, AGO-0183–0185.)

15      67.    On March 13, Defendant Risenhoover examined Plaintiff as a follow-up to his x-ray

16    and lab work.  She informed him that the x-ray of his right knee did not reveal significant

17    abnormalities.  (Risenhoover Decl. ¶ 31; Kenny Decl. Ex. A, AGO-0193–0195.)

18      68.    On March 30, Defendant Risenhoover examined Plaintiff.  She reviewed Plaintiff's

19    case with Defendant Sayre the day before regarding Plaintiff's history of iron deficiency anemia.

20    During the visit, Plaintiff complained that his right knee was swollen and that he felt stiff.  He

21    requested Tylenol and Ibuprofen.  She ordered Tylenol and Ibuprofen.  (Risenhoover Decl. ¶ 32;

22    Kenny Decl. Ex. A, AGO-0204–0207.)

23      69.    In March 2007, the Pelican Bay lab took another x-ray of Plaintiff's right knee.  The

24    radiologist noted that there was "no obvious soft tissue swelling or calcification" or any other

25    changes since the August 2005 x-ray.  (Sayre Decl. ¶ 22; Kenny Decl. Ex. A, AGO-0186.)

26      70.    On April 20, Defendant Risenhoover examined Plaintiff.  Plaintiff requested an MRI

27    of his right knee and right hip, a CT scan of his head, and Defendant Sayre's review of Plaintiff's

28    "chart."  He stated that his headaches were constant and that reading glasses did not help.  She

17

1    requested Plaintiff's referral to Dr. Cochrane, an Ophthalmologist, for Plaintiff's complaints of

2    blurry vision.  On April 24, the MAR approved her request.  (Risenhoover Decl. ¶ 33; Kenny

3    Decl. Ex. A, AGO-0211–0214.)

4         71.    On May 31, Defendant Risenhoover examined Plaintiff.  He stated that he had a

5    bulging disc in his back, a tingling sensation in his spine, and that he was afraid of falling and

6    hitting his head.  He requested antacids and Prilosec to address upset stomach.  She reordered

7    Naprosyn to address Plaintiff's complaints of pain and discontinued the Ibuprofen at Plaintiff's

8    request.  She scheduled Plaintiff for an upper gastrointestinal examination (UGI).  An UGI uses

9    x-rays to diagnose problems in the upper gastrointestinal system—that is, the esophagus, the

10   stomach and the first part of the small intestines.  It can show blockages, abnormal growths,

11   ulcers or other problems.  She rescheduled Plaintiff for follow-up in thirty days regarding the

12   ophthalmology consult and the UGI.  (Risenhoover Decl. ¶ 34; Kenny Decl. Ex. A, AGO-0222–

13   0225.)

14        72.    On July 17, Defendant Risenhoover examined Plaintiff.  He stated that the ring finger

15   on his right hand was swollen and painful.  She ordered Neosporin and Erythromycin to address

16   the finger injury.  Neosporin is an antibiotic ointment used to prevent of infection and speed the

17   healing of wounds.  Erythromycin is used to treat many different types of infections caused by

18   bacteria.  She also reordered Naprosyn and Prilosec.  She rescheduled Plaintiff for follow-up in

19   fourteen days regarding the finger injury.  (Risenhoover Decl. ¶ 35; Kenny Decl. Ex. A, AGO-

20   0237–0242.)

21        73.    On August 14, Defendant Risenhoover examined Plaintiff.  He stated that his finger

22   had not improved.  He also stated that the right side of his body hurt, and his right hip and back

23   hurt whenever he walked for thirty minutes.  She ordered an x-ray of his right hip and advised

24   him to apply a warm compress to the finger.  She rescheduled Plaintiff for follow-up once the lab

25   x-rayed Plaintiff's right hip.  (Risenhoover Decl. ¶ 36; Kenny Decl. Ex. A, AGO-0253–0257.)

26        74.    On September 7, Defendants Sayre and Risenhoover reviewed Plaintiff's case.  As a

27   result of that examination and review of Plaintiff's medical records, particularly an August 2007

28   x-ray of Plaintiff's right hip, Defendant Sayre recommended, and Defendant Risenhoover then

18

1    requested, Plaintiff's referral to Dr. Duncan. Defendants Sayre and Risenhoover also determined

2    that he did not need additional medical treatment for the finger injury. (Sayre Decl.¶ 23;

3    Risenhoover Decl. ¶ 37; Kenny Decl. Ex. A, AGO-0262–0266.)

4        75.   On October 2, Defendant Risenhoover examined Plaintiff to follow-up on the x-rays.

5    She informed him that Dr. Duncan would see him and that Plaintiff did not need additional

6    medical treatment for the finger injury. (Risenhoover Decl. ¶ 38; Kenny Decl. Ex. A, AGO-

7    0270–0273.)

8        76.   On October 17, Dr. Duncan examined Plaintiff. He noted that "[t]here is about 80%

9    normal motion in the right hip," and "[r]ecent x-rays from August 17 of the right hip do show

10   some cystic change in the femoral head and some loss of sphericity of the femoral head consistent

11   with arthritis and possibly related to an underlying avascular necrosis." He determined that the

12   arthritis in Plaintiff's right hip had increased somewhat, but recommended against surgery. He

13   also recommended a cane and knee sleeve based on the arthritis. (Sayre Decl. ¶ 24; Risenhoover

14   Decl. ¶ 39; Kenny Decl. Ex. A, AGO-0280–0281.)

15       77.   Avascular necrosis is a bone condition that results from poor blood supply to an area

16   of bone causing bone death. As the disease progresses, it leads to a decline in the range of motion

17   in the joint. The range of motion is a measurement of the extent to which a joint can go through

18   all of its normal movements. When surgery is not medically indicated, avascular necrosis is

19   treated with NSAIDs, reducing weight bearing, limiting use of the joint, and physical therapy

20   exercises. (Sayre Decl. ¶ 25.)

21       78.   Based on Dr. Duncan's examination and recommendations, and after reviewing

22   Plaintiff's case with Defendant Risenhoover, Defendant Sayre approved a knee sleeve and cane

23   for Plaintiff, and Defendant Risenhoover informed Plaintiff of this when she examined him on

24   November 2. (Risenhoover Decl. ¶ 40; Kenny Decl. Ex. A, AGO-0285–0287.) He also placed

25   Plaintiff in a Pelican Bay disability program. The program's purpose is to provide inmates with

26   appropriate housing and program opportunities without regard to disability. (Sayre Decl. ¶ 26.)

27       79.   On November 15, Defendant Risenhoover examined Plaintiff in response to an

28   inmate appeal. He stated that he wanted to know what Dr. Duncan gave him for pain

19

1   management, wanted to see Dr. Duncan again, wanted an MRI of his head, wanted wool caps,

2   and wanted extra pairs of thermal underwear.  She referred Plaintiff's requests to the MAR

3   committee for review.  (Risenhoover Decl. ¶ 41; Kenny Decl. Ex. A, AGO-0296–0302, 0309,

4   0314–0315.)

5        80.   On November 27, the MAR committee reviewed Plaintiff's requests.  The MAR

6   committee denied the request for thermal underwear and wool caps because they were not

7   medically indicated, denied the request for pain management through Dr. Duncan because

8   NSAIDs are the appropriate treatment for Plaintiff's arthritis, and denied Plaintiff's request for an

9   MRI of his brain because it was not medically indicated and because Plaintiff has a metal plate in

10  his head.  Because an MRI is by its nature magnetic, conducting one on a patient who has a metal

11  plate in his head could cause serious injury, even death.  (Risenhoover Decl. ¶ 42; Kenny Decl.

12  Ex. A, AGO-0320.)

13       81.   On December 27, Defendant Risenhoover examined Plaintiff.  He complained of

14  fatigue, again requested an MRI of his head, and stated that nothing was helping his headaches.

15  She informed Plaintiff that his headaches could not be caused from the cold, because the metal

16  plate in his head was the same temperature as the rest of his body.  She reordered Tylenol for

17  Plaintiff's complaints of pain and rescheduled Plaintiff for follow-up in thirty days regarding his

18  complaints of fatigue.  (Risenhoover Decl. ¶ 43; Kenny Decl. Ex. A, AGO-0328, 0332–0334.)

19       **E.   Overview of Plaintiff's Treatment.**

20       82.   Plaintiff's condition was monitored at all times and Plaintiff's medical condition and

21  health issues were being carefully monitored and treated by his physicians.  During the time

22  period in question, the records show Plaintiff had received various studies and examinations,

23  including CT scans, MRI studies and nerve conduction studies.  (Sayre Decl. ¶ 26.)  More

24  specifically, Pelican Bay medical providers examined Plaintiff at least forty-eight times between

25  October 20, 2005 and January 18, 2008.  This does not include the specialists' examinations and

26  the numerous diagnostic tests such as seventeen diagnostic tests relating to Plaintiff's anemia and

27  complaints of diarrhea.  (Kenny Decl. ¶ 4.)  Plaintiff also attended twenty-seven physical therapy

28  sessions between August 2005 and January 2007.  (Kenny Decl. Ex. A, AGO-0355–0377.)  And

20

Defs.' Not. Mot. & Mot. Summ. J.; Mem. P & A                    *Grajeda v. Horel, et al.*
                                                                C 07-4752-PJH (PR)

1    many of Plaintiff's complaints are a reflection more of his age (fifty-seven) than any specific

2    medical condition. (Sayre Decl. ¶ 26.)

3         83.   Plaintiff claims that Pelican Bay medical providers were deliberately indifferent to

4    four medical conditions: (1) back pain; (2) headaches; (3) knee pain; and (4) hip pain. (Sayre

5    Decl. ¶ 27.)

6         84.   Regarding the **back pain**, the x-rays, MRIs, and dozens of physical examinations

7    documented in the medical records all indicate mild chronic low back pain.  Medical providers

8    appropriately treated this with NSAIDs, physical therapy, and reminders that Plaintiff should

9    avoid physical activity that could aggravate his condition. (Sayre Decl. ¶ 28.)

10        85.   Regarding the **headaches**, the appropriate treatment for headaches is NSAIDs.  Also,

11   Elavil can be effective in treating headaches.  However, Plaintiff refused to take Elavil. (Sayre

12   Decl. ¶ 29.)

13        86.   Regarding the **knee pain**, the x-rays indicated only arthritis, the arthroscopy showed

14   no pathology, and Dr. Duncan's examinations showed no significant abnormalities.  NSAIDs,

15   physical therapy, and reminders that Plaintiff should avoid physical activity that could aggravate

16   his condition were completely appropriate. (Sayre Decl. ¶ 30.)

17        87.   Regarding the **hip pain**, Pelican Bay medical providers appropriately treated Plaintiff

18   at all times.  The August 2007 x-ray was the first indication of possible avascular necrosis.  Even

19   so, it is very mild, as shown by, among other things, Plaintiff's range of movement, which is 80%

20   of normal.  The form of avascular necrosis that Plaintiff may have is treated with NSAIDs.

21   Plaintiff received NSAIDs during this time period.  It is treated by limiting the use of his hip.  The

22   medical records indicate that medical providers advised Plaintiff numerous times to avoid

23   strenuous exercise involving his hip and to stretch often.  It is also treated with physical therapy

24   exercises.  The MAR committee sent Plaintiff to physical therapy sessions three separate times.

25   And when there was some objective medical data indicating avascular necrosis, Plaintiff received

26   a cane. (Sayre Decl. ¶ 31.)

27        88.   Plaintiff claims he needs Neurontin for chronic pain, an MRI of his head, and

28   additional imaging of his back, right knee, and right hip.  But Plaintiff had many tests, procedures,

21

1    and examinations—none of them indicated an organic basis for the pain Plaintiff complains of.

2    Additionally, conducting an MRI of Plaintiff's head could have serious health consequences, as

3    the metal plate in Plaintiff's head would be disturbed by the magnetism. He also claims that he

4    should have had a cane and knee brace between May 2006 and October 2007. However, during

5    this time period, there was no objective medical data showing that a cane was medically indicated.

6    When there was such data, Plaintiff received a cane. (Sayre Decl. ¶ 32.)

7        89.   Plaintiff also claims that he received inadequate treatment because Pelican Bay

8    medical providers did not have his medical records from Corcoran State Prison during some of

9    this time period. But Dr. Maukonen referred in his March 2005 examination to a May 2003 MRI.

10   In any case, the medical records from Plaintiff's time at Corcoran confirm that Pelican Bay

11   medical providers appropriately treated Plaintiff. Specifically: the February 4, 2003 x-ray of

12   Plaintiff's pelvis; the February 4, 2003 medical records from University Medical Center; the June

13   10, 2003 CT scans of Plaintiff's sinuses and brain; the August 1, 2003 x-ray of Plaintiff's hip; and

14   the orthopedic consultations from April 2003, June 11, 2003, and August 27, 2003. None of these

15   documents support providing Plaintiff with the medical care that he seeks. (*Id.* ¶ 33.)

16       90.   At all times, Plaintiff's care was within the California Department of Corrections and

17   Rehabilitation's standard of care and was consistent with the degree of knowledge and skill

18   ordinarily possessed and exercised by members of Defendants' profession under similar

19   circumstances. Medical providers never denied Plaintiff medically necessary or medically

20   warranted treatment. (Sayre Decl. ¶ 34; Risenhoover Decl. ¶ 44; Rowe Decl. ¶ 16.)

21       91.   Given Plaintiff's complaints and clinical presentation, his medical treatment was

22   proper. Plaintiff's complaints were not of an emergency nature, nor did he present with any

23   condition requiring treatment that was not provided. Medical providers appropriately treated

24   Plaintiff's medical complaints, and never intentionally or deliberately delayed providing him

25   medical treatment. No medical providers sought to cause Plaintiff medically unnecessary injury,

26   or undue pain and suffering. At all times, medical providers treating Plaintiff were motivated by

27   a genuine concern for Plaintiff's health and well-being. (Sayre Decl. ¶ 35; Risenhoover Decl. ¶

28   45; Rowe Decl. ¶ 17.)

22

**F.    Plaintiff's Government Tort Claim.**

92.    On June 27, 2007, Plaintiff served a government tort claim on the Victim

Compensation and Government Claims Board, which received it on July 2, 2007.  (Kenny Decl.

Ex. B at letter dated July 13, 2007.)  Plaintiff alleged in the claim that Pelican Bay medical

providers were deliberately indifferent because Defendant Sayre ordered Defendant Risenhoover

to revoke Plaintiff's permission to have a cane and knee brace, Defendant Sayre did not give

Plaintiff wool caps or return the cane and knee brace, Defendant Risenhoover did not return the

cane, and they did not have Plaintiff's medical records from Corcoran.  Plaintiff did not plead

medical malpractice or negligence.  (Kenny Decl. Ex. B at unnumbered pages 1–3 attached to

claim.)

## SUMMARY OF ARGUMENT

Plaintiff has failed to show that there is a triable issue of material fact that he was deprived

of the rights guaranteed to the prison inmate under the Eighth Amendment or that the standard of

care was breached.  A disagreement with Defendant Rowe, Sayre and Risenhoover's medical

judgment does not establish deliberate indifference or a breach of the standard of care.

Defendants treated Plaintiff based on valid Pelican Bay policies and the exercise of their medical

judgment.  Further, because Defendants acted reasonably and pursuant to valid polices, they did

not violate clearly established law, and are entitled to qualified immunity.

## ARGUMENT

I.    **PLAINTIFF'S EIGHTH AMENDMENT CLAIM FOR DELIBERATE INDIFFERENCE
AGAINST DEFENDANTS ROWE RISENHOOVER, AND SAYRE SHOULD BE DISMISSED
BECAUSE THEY APPROPRIATELY TREATED HIS COMPLAINTS OF WEAKNESS,
FATIGUE, HEADACHES, BACK PAIN, KNEE PAIN, AND HIP PAIN.**

**A.    Legal Standard for Summary Judgment.**

Summary judgment is appropriate "where there is no genuine issue as to any material fact,

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A court must

enter summary judgment where the responding party "fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  There is

1   no triable issue of fact unless there is sufficient evidence favoring the nonmoving party for a jury

2   to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

3          Once a defendant has met his or her initial burden of informing the Court of the basis for

4   summary judgment, and has identified evidence demonstrating the absence of a genuine issue of

5   material fact, the burden shifts to the plaintiff to establish the actual existence of a genuine issue

6   as to any material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

7   (1986). In attempting to establish the existence of this factual dispute, a plaintiff may not rely

8   upon the mere allegations or denials of his pleadings, but instead must tender evidence of specific

9   facts in the form of affidavits or other admissible evidence, in support of his contention that the

10   dispute exists. Fed. R. Civ. P. 56(e); *Matsushita,* 475 U.S. at 586 n.11. Although normally the

11   court draws all justifiable inferences in the non-moving party's favor when ruling on a motion for

12   summary judgment, in disputed matters of professional judgment, the court must give deference

13   to the views of prison officials. *Beard v. Banks*, 548 U.S. 521, 522 (2006).

14   **B.     Defendants Rowe, Risenhoover, and Sayre Were not Deliberately
         Indifferent because they Exhaustively Addressed Plaintiff's Numerous**

15   **         Complaints.**

16          A plaintiff must prove "deliberate indifference to serious medical needs" to establish an

17   Eighth Amendment claim arising out of inadequate medical care. *Estelle v. Gamble*, 429 U.S. 97,

18   104 (1976). In the Ninth Circuit, deliberate indifference is shown by a two-prong test. *McGuckin*

19   *v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992) *overruled on other grounds by WMX Techs., Inc.*

20   *v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

21          First, the plaintiff must show an objectively "serious medical need" by demonstrating that

22   "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary

23   and wanton infliction of pain.'" *Id.* at 1059 (citing Estelle, 429 U.S. at 104). "[T]he existence of

24   chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for

25   medical treatment." *McGuckin*, 974 F.2d at 1059–60.

26          Second, the plaintiff must show that the defendant acted with deliberate indifference, which

27   is a subjectively "sufficiently culpable state of mind" that is more than mere negligence but less

28   than conduct undertaken for the very purpose of causing harm. *Farmer v. Brennan*, 511 U.S. 825,

24

1   837 (1994).  A prison official is only liable under the Eighth Amendment if the official "knows

2   that inmates face a substantial risk of serious harm and disregards that risk by failing to take

3   reasonable measures to abate it." *Id.* at 847.

4          In applying this standard, the Ninth Circuit has held that before a prisoner's civil rights can

5   be deemed to have been abridged, the indifference to his medical needs must be substantial.

6   Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."

7   *Broughton v. Cutter*, 622 F.2d 458, 460 (9th Cir. 1980) (citing *Estelle*, 429 U.S. at 105–6.)

8   Allegations consisting of little more than differences of medical opinion regarding a treatment

9   method are "insufficient, as a matter of law to establish deliberate indifference." *Jackson v.*

10  *McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir.

11  1989)).  Prison officials may also be deliberately indifferent to serious medical needs when "they

12  deny, delay, or intentionally interfere with medical treatment." *Wood v. Housewright*, 900 F.2d

13  1332, 1334 (9th Cir.1990) (quoting *Hutchinson v. United States*, 838 F.2d 390, 393 (1988)).  But

14  the delay must cause serious harm to the inmate.  *Shapley v. Nev. Bd. of State Prison Comm'rs*,

15  766 F.2d 404, 407 (9th Cir.1985).

16         Most importantly for the present case, "a difference of opinion between a prisoner–patient

17  and prison medical authorities regarding treatment does not give rise to a Section 1983 claim."

18  *Franklin v. State of Oregon, State Welfare Division*, 662 F.2d 1337, 1344 (9th Cir. 1981).  Rather,

19  an inmate plaintiff making such an allegation bears the burden of establishing both "that the

20  course of treatment the doctors chose was medically unacceptable under the circumstances" and

21  "that they chose this course in conscious disregard of an excessive risk to plaintiff's health."

22  *Franklin,* 662 F.2d at 1344.  And in cases involving a prison medical provider's denial of an

23  inmate's request for an outside consultation, "a prison inmate has no independent constitutional

24  right to outside medical care additional and supplemental to the medical care provided by the

25  prison staff within the institution." *Roberts v. Spalding*, 783 F.2d 867, 870 (9th Cir.1986).

26         Where an inmate complains of chronic and substantial pain, the inmate's allegations that

27  the medical treatment he received did not relieve his pain as much as his proffered alternative or

28  that more diagnostic studies would lead to a better outcome do not constitute evidence of

25

1  deliberate indifference. *See, e.g., Esposito v. Khatri, et al.*, No. 08-cv-742-H, 2009 WL 702218

2  (S.D. Cal. Mar. 16, 2009); *Thomas v. California Dep't of Corr.*, No. 1:06-cv-00104-LJO-WMW,

3  2009 WL 691986 (E.D. Cal. Mar. 16, 2009); *Belle v. Stampler, et al.*, No. CV 04-298 TUC

4  (DCB), 2006 WL 3792038 (D. Ariz. Dec. 21, 2006); *Martinez v. Woodford*, No. C 05-1150 MHP,

5  2006 WL 2038490 (N.D. Cal. July 20, 2006).

6      In *Belle*, an inmate who had neck and pain problems since age twelve and complained of

7  cervical spinal damage, numbness in his fingers and toes, and pain in his neck and back, alleged

8  that his medical providers were deliberately indifferent because they failed to follow a

9  neurosurgeon's recommendations for a cervical MRI and surgery for two years. 2006 WL

10  3792038, at *1. Plaintiff's medical providers assessed Plaintiff with a fused spine and blood in

11  his rectum, but ordered EMG and nerve conduction studies rather than an MRI, and prescribed

12  Naprosyn,[5] Tylenol, and Ibuprofen rather than narcotics. *Id.* at *4–8. The court granted

13  defendants' motion for summary judgment because Plaintiff failed to show that he was denied

14  medical care for any reason other than differing opinions and failed to show that his medical

15  providers' actions caused him harm. *Id.* at *9.

16      In *Martinez*, an inmate complaining of pain in his back and numbness and pain in his toes

17  had an older x-ray report showing evidence of scoliosis and degeneration in his back, and a more

18  recent one showing no such evidence. The plaintiff's medical providers prescribed Naprosyn,

19  Motrin, Elavil, and Tylenol rather than narcotics. The medical providers and a medical review

20  committee denied Plaintiff's requests for a MRI of his spine and nerve conduction studies. 2006

21  WL 2038490, at *1–3. The court granted the defendants' motion for summary judgment because

22  the undisputed facts showed that the plaintiff's medical providers believed that they properly

23  treated the plaintiff. *Martinez*, 2006 WL 2038490, at *5.

24      In *Esposito*, an inmate with spinal stenosis, lumbrosacral strain, and radiculapathy who

25  received epidural steroidal injections alleged that his medical providers (including the chief

26

----

27     [5] The case reflects that medical providers prescribed Plaintiff "Naproxin." Naproxin is an alternate spelling of Naproxen. Naproxen and Naprosyn are the same thing.

28  (http://www.drugs.com/naprosyn.html) (last accessed on April 29, 2009).

26

*Grajeda v. Horel, et al.*
C 07-4752-PJH (PR)

1   medical officer and another prison physician) were deliberately indifferent because they delayed

2   sending him to physical therapy sessions. 2009 WL 702218, at *1–2. The court held that

3   Plaintiff could not state a deliberate indifference claim against his medical providers because they

4   actively addressed Plaintiff's condition, even though they did not do everything Plaintiff

5   requested. *Id.* at *4–6.

6       Here, Plaintiff, who is fifty-seven years old, has received more extensive medical care than

7   the inmates in *Belle*, *Martinez*, and *Esposito*, although his medical condition appears less serious.

8   Defendant Rowe treated Plaintiff on three occasions—although Plaintiff left before one of the

9   visits could be completed—between October 20, 2005, and January 20, 2006 since she returned to

10   Pelican Bay on January 29, 2005. She has not treated him since. (Rowe Decl. ¶¶ 23–34.)

11   Defendant Rowe did not see Plaintiff anytime between June 29, 2004, and March 22, 2005, as

12   Plaintiff alleges in the Complaint. (*Id.*) There is no record of Plaintiff complaining that his

13   anemia was not treated. Defendant Rowe recommended epidural steroid injections for Plaintiff's

14   complaints of pain (Rowe Decl. ¶ 23), reordered Neurontin (*Id.* ¶ 27), gave Plaintiff permission to

15   wear a wool cap (*Id.* ¶ 28), ordered Tylenol (*Id.* ¶ 32), and requested Plaintiff's referral to a

16   neurologist. (*Id.* ¶ 33.)

17       Plaintiff has received diagnostic tests, including MRIs, relating to his complaints of

18   headaches, knee pain, back pain, and hip pain. He received Naprosyn and numerous other

19   NSAIDs as well as Elavil, and no specialist recommended surgery. No outside specialist has

20   recommended wool caps. Defendants also referred him to five separate consultations and twenty-

21   seven physical therapy sessions. Pelican Bay policies *required* discontinuation of the cane and

22   knee brace in May 2006. (*See* Risenhoover Decl. Ex. B, AGO-0384.) And when objective

23   medical data suggested a deterioration of Plaintiff's right hip, Defendants Risenhoover and Sayre

24   provided Plaintiff a cane, and Defendant Sayre placed him in Pelican Bay's disability program.

25       In addition to treating the complaints Plaintiff raises in the Complaint, Defendants Sayre

26   and Risenhoover resolved Plaintiff's anemia and complaints of diarrhea through seventeen

27   diagnostic tests, supplements, an EDG and Colonoscopy, and an UGI. They also referred him to

28   an Ophthalmologist to address his complaints of blurry vision. (Risenhoover Decl. ¶¶ 6–8, 12–23,

27

1   26–27, 32–34; Sayre Decl. ¶ 18.)

2       Plaintiff claims that Defendants did not have access to Plaintiff's medical records from

3   Corcoran for more than two years. (Compl. ¶¶ 16, 41.) Assuming that the absence of Plaintiff's

4   medical records relates to Plaintiff's deliberate indifference claim involving the discontinuation of

5   a cane and knee brace, the record shows that Plaintiff's medical records were available long

6   before then, as Dr. Maukonen referred in his March 2005 examination to a May 2003 MRI. (*See*

7   Sayre Decl. ¶ 33.) If Defendants did not have Plaintiff's medical records, this does not amount to

8   deliberate indifference as a matter of law. *See Housewright*, 900 F.3d at 1334 (prison officials'

9   failure to obtain inmate's medical records, "though apparently inexcusable," did not amount to

10   deliberate indifference). In any case, the medical records indicate that Pelican Bay medical

11   providers treated Plaintiff appropriately. (Sayre Decl. ¶ 33; Risenhoover Decl. ¶ 29.)

12       In the present matter, Plaintiff has not produced—and cannot produce—evidence that

13   Defendant Rowe purposefully ignored or failed to properly treat his anemia and Defendants

14   Risenhoover and Sayre purposely ignored or failed to properly treat his complaints of headaches,

15   back pain, knee pain, and hip pain by discontinuing the cane and knee brace. Plaintiff's personal

16   opinion is he should have received Neurontin, a cane and knee brace between May 2006 and

17   October 2007, and additional diagnostic tests. But there is no medical evidence that such

18   medication or treatment was medically necessary at the time asserted by Plaintiff. The numerous

19   physical examinations, referrals to specialists, and diagnostic tests conducted firmly establish

20   concern for Plaintiff's health. Plaintiff's unsupported allegations that the medical care was

21   inadequate do not rise to the level of deliberate indifference.

22   **II.   DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.**

23       Qualified immunity shields an official from civil-damages liability unless his conduct

24   violated clearly established law, of which a reasonable official would have known. *Harlow v.*

25   *Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, it gives officials "ample room for mistaken

26   judgments by protecting all but the plainly incompetent or those who knowingly violate the law."

27   *Hunter v. Bryant,* 502 U.S. 224, 229 (1991) (internal quotes and citation omitted). It also

28   prevents "deterrence of able people from public service." *Id.* And in reference to prisons, it

28

1   allows officials to use their expertise—based on years of observation and practice—to maintain

2   order without fear of liability for doing what seemed "reasonable" at the time. *See Jeffers v.*

3   *Gomez,* 267 F.3d 895, 917 (9th Cir. 2001).

4       Because qualified immunity is immunity from suit rather than a mere defense to liability, its

5   application should be decided at the earliest possible stage in litigation. *Hunter v. Bryant,* 502

6   U.S. 224, 227–28 (1991).  The costs, time, and effort needed for officials to defend suits can be

7   "peculiarly disruptive of effective government," especially in light of discovery obligations.

8   *Harlow,* 457 U.S. at 817.

9       Proving one's prima facie case does not necessarily defeat qualified immunity.  "[R]uling

10  on qualified immunity requires an analysis not susceptible to fusion with the question whether

11  [the underlying act was committed]." *Saucier v. Katz*, 533 U.S. 194, 197 (2001).  Therefore, even

12  if a plaintiff proves the elements of his prima facie case, he must independently overcome

13  qualified immunity.

14      Furthermore, qualified immunity is not defeated by disputed facts.  *In Estate of Ford*, 301

15  F.3d 1043 (9th Cir. 2002), the Ninth Circuit held that "qualified immunity may [not] be denied in

16  an Eighth Amendment case solely because there is a triable issue of fact as to whether a prison

17  official was deliberately indifferent to an inmate's safety." *Id.* at 1045.  The principle underlying

18  qualified immunity "is an entitlement not to stand trial or face the other burdens of litigation."

19  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  The privilege is "an immunity from suit rather

20  than a mere defense to liability; and like an absolute immunity, it is effectively lost if a

21   case is erroneously permitted to go to trial."  *Mitchell*, 472 U.S. at 526.  Therefore, Plaintiff

22  cannot defeat a qualified immunity claim simply because there may be disputed factual issues.

23      Until recently, courts considering the application of qualified immunity were required to

24  conduct a mandatory two-part inquiry in a specific order: (1) determining whether there was a

25  constitutional violation; and (2) determining whether the right was clearly established. *Saucier*,

26  533 U.S. at 201.  But in January 2009, the Supreme Court announced that, while the sequence set

27  out in Saucier is often beneficial and appropriate, it should no longer be regarded as mandatory,

28  and courts are free to conduct the inquiry in any order deemed most useful. *Pearson v. Callahan*,

29

1   129 S. Ct. 808, 818 (2009).  The *Pearson* decision also relieves the parties and the courts of the

2   "academic exercise" of litigating constitutional issues in cases where it is plain that the asserted

3   right is not clearly established.  *Id.*

### A.   Defendants Did Not Violate Plaintiff's Constitutional Rights.

5        The first step under Saucier is to determine whether, taken in the light most favorable to the

6   party asserting the injury, the facts alleged show that the medical provider's conduct violated a

7   constitutional right.  *Saucier*, 533 U.S. at 201.  As discussed, Defendants did not violate

8   Plaintiff's Eighth Amendment rights.

### B.   Defendants Acted Reasonably Based on Clearly Established Law.

10       If the Court disagrees and determines that Plaintiff has established that his constitutional

11  rights were violated by Defendants' conduct, Defendants are still entitled to qualified immunity

12  under *Saucier's* second prong because it would not have been clear to reasonable prison

13  employees that their conduct violated Plaintiff's clearly established rights.

14       In this case, Plaintiff alleges that his Eighth Amendment right to be free from cruel and

15  unusual punishment was violated by Defendants.  As discussed above, Defendants violated no

16  constitutional right.  Defendants Rowe, Risenhoover, and Sayre appropriately and reasonably

17  exercised their best medical judgment by treating Plaintiff's condition.  There is no evidence that

18  Defendant Rowe's course of treatment or her exercise of professional medical judgment was

19  inappropriate given that she addressed Plaintiff's complaints during the three occasions she

20  treated him.  There is no evidence that Defendants Sayre and Risenhoover's course of treatment

21  or their exercise of professional medical judgment was inappropriate given that Plaintiff did not

22  meet the criteria for a cane and knee brace between May 2006 and November 2007 (Risenhoover

23  Decl. ¶¶ 8–11, Ex. B, AGO-0384; Sayre Decl. ¶ 8, 27–32), they referred him to physical therapy

24  sessions, prescribed numerous medications, and diagnostic tests did not indicate serious problems.

25  Plaintiff's difference of opinion that a cane and knee brace was warranted does not establish that

26  Defendants Risenhoover and Sayre acted with deliberate indifference in reaching a different

27  result.  Because the Defendants' actions were "objectively reasonable," each Defendant is, based

28  on the above, entitled to qualified immunity.

30

---

Defs.' Not. Mot. & Mot. Summ. J.; Mem. P & A                    *Grajeda v. Horel, et al.*
                                                                C 07-4752-PJH (PR)

**III.   PLAINTIFF DID NOT PLEAD MEDICAL MALPRACTICE IN HIS CALIFORNIA TORT CLAIM.**

A plaintiff may not file a civil action against a public entity or its employees for damages unless he first presented a timely written claim to the defendant and the defendant rejected it in whole or in part. Cal. Gov't Code §§ 905, 905.2, 945.4. If the plaintiff is relying on more than one legal theory of recovery, "the facts underlying each cause of action in the complaint must have been fairly reflected in a timely claim." *Stockett v. Association of Cal. Water Agencies Joint Powers Ins. Auth.*, 34 Cal. 4th 441, 447 (2004). If there is variance between the government tort claim and the complaint, the complaint may be dismissed. *Watson v. California*, 21 Cal. App. 4th 836, 844 (Ct. App. 1993) (dismissing inmate's complaint based on the theory that State failed to provide inmate with appropriate and adequate medical treatment, when government claim was based on the theory that the State refused to provide medical treatment).

Plaintiff's tort claim alleged only a violation of the Eighth Amendment of the United States Constitution. He did not allege medical malpractice or negligence causes of action. (Kenny Decl. Ex. B at pages attached to claim.) In addition to alleging an Eighth Amendment violation, Plaintiff's Complaint "presents state law medical malpractice claims." (Order of Service 2:22–25, February 25, 2008.) In other words, Plaintiff's government tort claim alleged deliberate indifference, while his Complaint alleged medical malpractice as well. Because of this variance between Plaintiff's government tort claim and his Complaint, Plaintiff's medical malpractice claim should be dismissed. *See Watson*, 21 Cal. App. 4th at 844.

**IV.   THE MEDICAL MALPRACTICE CLAIM AGAINST DEFENDANTS SAYRE AND RISENHOOVER MUST BE DISMISSED BECAUSE THEIR MEDICAL DECISIONS WERE DICTATED BY THE STANDARD OF CARE.**

To establish a prima facie case of professional malpractice, a plaintiff must prove by a preponderance of the evidence a breach of the standard of care. *Bucquet v. Livingston*, 57 Cal. App. 3d 914, 920-921 (Ct. App. 1976).

Medical providers at Pelican Bay may only provide medical services "which are based on medical necessity and supported by outcome data as effective medical care." Cal. Code Regs. tit. 15, § 3350(a). A service is medically necessary if the medical provider determines "it is

31

1   reasonable and necessary to protect life, prevent significant illness or disability, or alleviate

2   severe pain," and is considered by health outcome data to be effective medical care. *Id.* §

3   3350(b)(1)–(2). Severe pain means "a degree of discomfort that significantly disables a patient

4   from reasonable independent function," and significant illness or disability "means any medical

5   condition that causes or may cause if left untreated a severe limitation of function or ability to

6   perform the daily activities of life or that may cause premature death." *Id.* §§ 3350(b)(4)–(5).

7        Prison medical providers, acting individually or collectively, are not held to a higher

8   standard of care than their counterparts in private practice. A committee of prison doctors "may

9   determine the best road to take with respect to medical decisions." *Belle v. Stampler, et al.*, No.

10  CV 04-298 TUC (DCB), 2006 WL 3792038, at *9 (D. Ariz. Dec. 21, 2006). And "doctors

11  outside of the prison system are not required to respond to patients' requests on a daily basis, nor

12  are they expected to comply with every request for specific procedures. Prison doctors cannot be

13  expected to abide by a different standard of care . . . ." *Id.*

14       As set forth above, Defendants Rowe, Sayre, and Risenhoover provided Plaintiff with all

15  medically necessary services. Because Plaintiff cannot prove a breach of the standard of care,

16  Defendant Risenhoover is entitled to judgment as a matter of law on Plaintiff's state law claims.

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

32

1

**CONCLUSION**

2    Defendants Rowe, Sayre, and Risenhoover are entitled to judgment as a matter of law on

3  Plaintiff's deliberate indifference claim because they provided appropriate medical treatment

4  based on the numerous physical examinations, diagnostic tests, and outside consultations, and

5  Defendants' assessment of his medical needs.  Defendants are also entitled to qualified immunity.

6  Plaintiff's medical malpractice claim should be dismissed because it was not pled in his

7  government tort claim.  Finally, Defendants Sayre and Risenhoover are entitled to judgment as a

8  matter of law on Plaintiff's medical malpractice claim because they provided appropriate medical

9  treatment.

10  Dated:  May 11, 2009                         Respectfully Submitted,

11                                               EDMUND G. BROWN JR.
                                                 Attorney General of California
12                                               MICHAEL W. JORGENSON
                                                 Supervising Deputy Attorney General

13

14

15

16                                               BRENDAN M. KENNY
                                                 Deputy Attorney General
17                                               Attorneys for Defendants McLean, Sayre,
                                                 Rowe, Horel, and Risenhoover

18

19  SF2008401032
    20196181.doc

20

21

22

23

24

25

26

27

28

33

Defs.' Not. Mot. & Mot. Summ. J.; Mem. P & A                    *Grajeda v. Horel, et al.*
                                                               C 07-4752-PJH (PR)

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:   **T. Grajeda v. R. Horel, et al.**
No.:   **C 07-4752 PJH**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On **May 11, 2009**, I served the attached

**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**

**DECLARATION OF BRENDAN KENNY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**DECLARATION OF DEFENDANT RISENHOOVER IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**DECLARATION OF DEFENDANT ROWE IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**DECLARATION OF DEFENDANT SAYRE IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**DEFENDANTS' REQUEST FOR JUDICIAL NOTICE**

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

Thomas Grande Grajeda (V-22200)
Pelican Bay State Prison
P. O. Box 7500
Crescent City, CA 95531
In Pro Per

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on **May 11, 2009,** at San Francisco, California.

| | |
|---|---|
| M. Luna | *M. Luna* |
| Declarant | Signature |

SF2008401032
20199215.doc