EDMUND G. BROWN JR.
Attorney General of California
MICHAEL W. JORGENSON
Supervising Deputy Attorney General
BRENDAN M. KENNY
Deputy Attorney General
State Bar No. 237969
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-7004
  Telephone: (415) 703-5744
  Fax: (415) 703-5480
  E-mail: Brendan.Kenny@doj.ca.gov

Attorneys for Defendants McLean, Sayre, Rowe, Horel, and Risenhoover

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THOMAS GRAJEDA,<br><br>                Plaintiff,<br><br>v.<br><br>ROBERT A. HOREL, et al.,<br><br>                Defendants. | C 07-4752 PJH (PR)<br><br>**DECLARATION OF DEFENDANT RISENHOOVER IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>[No hearing per February 6, 2009 order of service] |

    I, S. Risenhoover, CFNP, declare as follows:

    1.  I am employed by the California Department of Corrections and Rehabilitation as a Certified Family Nurse Practitioner at Pelican Bay State Prison, and have been employed at Pelican Bay since February 9, 2004. As a Certified Family Nurse Practitioner, I am responsible for providing primary and continuing care to Pelican Bay inmates. I have been a licensed Registered Nurse since January 1, 1973, and have been a Certified Family Nurse Practitioner since 1981. I submit this declaration in support of Defendants' Motion for Summary Judgment. I

//

1

am competent to testify to the matters set forth in this declaration, and if called upon to do so, I could and would so testify.

2. Although I do not have an independent recollection of how long I have treated Plaintiff Thomas Grajeda (Plaintiff), Plaintiff's medical records indicate that I began reviewing his laboratory tests on February 21, 2006, refilling his medication in March 2006, and individually treating him in May 2006. These medical records are attached to the Declaration of Brendan Kenny as Exhibit A and bate-stamped AGO-0001 through AGO-0377. I have also reviewed Plaintiff's inmate appeals that he submitted during this time, and the institution's responses to the appeals.

3. As part of my duties described above and prior to the examination of inmates, it is my custom and practice to review the pertinent portions of an inmate's medical file to determine how best to address the inmate's condition. In my medical chart for the examination I generally note that I reviewed the medical records; often, I document which particular records I reviewed. When I treat inmates, I generally consider each case on an individual basis in accordance with Pelican Bay policies and procedures, Title 15 of the California Code of Regulations, and the Department of Correction and Rehabilitation Operations Manual. Specifically, Title 15 sections 3350, 3350.1(d), 3352, 3352.1, the DOM sections 91040.19.2–91040.26 provisions concerning inmate medical care, and Pelican Bay's medical policies contained in Chapter 3 entitled "Health Care Services Requests Policies and Procedure," and Chapter 18a entitled "Medical Chrono Policy and Procedure." A true and correct copy of the version of Chapter 3 in effect between October 2005 and the present is attached as Exhibit A and bate-stamped AGO-0378–0381. A true and correct copy of the version of Chapter 18a in effect between Ocotber 2005 and the present is attached as Exhibit B and bate-stamped AGO-0382–0384.

4. On February 21, 2006, I reviewed the results of Plaintiff's total iron-binding capacity test. This test measures the maximum amount of iron that a patient's blood can carry. Primary care providers order this test for inmates whom they suspect have iron deficiency and/or anemia. The higher the iron-binding capacity is, the greater the likelihood of iron deficiency and/or

2

Decl. Risenhoover Supp. Defs.' Mot. Summ. J.                    Grajeda v. Horel, et al.
                                                                C 07-4752-PJH (PR)

1  anemia. Plaintiff's test indicated an above-average iron-binding capacity. (Kenny Decl. Ex. A,
2  AGO-0038.)

3  5. On April 13, Dr. Emani examined Plaintiff. Plaintiff was very angry that the Medical
4  Advisory Review (MAR) Committee denied his request for a neurological consultation. He
5  stated that the epidural injections did not help. Dr. Enami stated that he would bring Plaintiff's
6  request to the MAR committee again. Dr. Enami asked about Plaintiff's symptoms, but Plaintiff
7  became increasingly agitated and used profanities. As a result, correctional officers removed
8  Plaintiff from the room before Dr. Enami could complete the examination. (*Id.* AGO-0046.)

9  6. On May 1, I examined Plaintiff. Based on Plaintiff's prior complaints of diarrhea, I
10 ordered hemoccult fecal blood test cards. These test stools for blood. I wanted to rule out fecal
11 bleeding, since this can indicate colorectal cancer. I ordered Prilosec for the day after the fecal
12 blood test, and ordered ferrous sulfate and vitamin C for ninety days after the test. (*Id.* AGO-
13 0052.)

14 7. Prilosec can help alleviate heartburn, which Plaintiff complained of earlier. Ferrous
15 sulfate is used to treat iron deficiency, which was suggested by Plaintiff's prior complaints of
16 dizziness and fatigue. Vitamin C deficiency was suggested by Plaintiff's prior complaints of
17 dizziness and fatigue. I also referred Plaintiff for an Esophagogastroduodenoscopy (EGD) based
18 on his reported history of iron deficiency and his recorded iron-binding capacity. An EGD is a
19 diagnostic endoscopic procedure that visualizes the upper part of the gastrointestinal tract. I
20 renewed Plaintiff's permission for a neoprene sleeve for Plaintiff's right knee. A neoprene sleeve
21 gently compresses the area around the knee and improves neuromuscular control. I scheduled
22 Plaintiff to return in seven days to follow-up the MAR committee's review of his treatment. (*Id.*)

23 8. On May 1, after reviewing Plaintiff's medical file, including x-rays and an MRI of
24 Plaintiff's back, the MAR revoked Plaintiff's permission to have a cane, knee brace, and waist
25 chain cuffs because they were not medically indicated. The MAR committee also determined that
26 Plaintiff's request for a neurological consultation was not medically indicated. And the MAR
27 recommended Elavil for Plaintiff's complaints of pain.
28 //

3

9.  That same day, I interviewed Plaintiff in response to his inmate appeal PBSP-06-00709. Plaintiff stated that he would wait until the MAR committee decided whether to send him to a neurologist. He then stated that the interview was over, and walked out of the room. As he did so, he stated: "if you want the cane, you will have to come and take it from me. I am done."

10. On May 3 and May 5, Pelican Bay employees observed Plaintiff walking smoothly without a cane or a knee brace, and without favoring his left or right side.

11. On May 5, I again interviewed Plaintiff in response to his inmate appeal PBSP-06-00709. I informed him that the MAR committee reviewed an MRI and x-rays of his back and recommended Elavil for his complaints of pain, and determined that he did need a cane or a knee brace.[1] Plaintiff stated in response to the Elavil recommendation that "I am not taking any psych med." On that basis, I discontinued Elavil. I also informed him that Pelican Bay employees had observed him on two occasions walking smoothly without a cane or a knee brace, and without favoring his left or right side. I requested a non-metallic right knee sleeve for Plaintiff.

12. On May 11, I reviewed the results of the fecal blood test. They indicated that Plaintiff had no fecal bleeding. (Kenny Decl. Ex. A, AGO-0057.)

13. On June 5, I requested that an outside specialist perform an EDG and Colonoscopy on Plaintiff due to his history of iron deficiency and his complaints of chronic mid-abdominal pain.

14. On June 6, I examined Plaintiff in response to his inmate appeal PBSP-06-01027. Prior to the examination, I reviewed x-rays and Drs. Duncan and Maukonen's analyses of Plaintiff's right leg and lower back, as well as Patrick Dodgen's physical therapy notes from September 20, 2005. I ordered Myoflex for Plaintiff's complaints of pain, Mylanta for Plaintiff's complaints of stomach discomfort, and ferrous sulfate to address the iron-deficiency anemia. Plaintiff stated that he wanted an alternative to Elavil, because he would not take "psychotic" medication. He also requested physical therapy sessions. I advised Plaintiff to avoid strenuously exercising his back and right knee and also increase stretches and warm-ups before exercising. I

---

[1] Although the inmate appeal PBSP-06-00709 response reflects that the MAR committee discontinued Plainiff's permission to have a knee sleeve, the knee sleeve was never confiscated.

4

Decl. Risenhoover Supp. Defs.' Mot. Summ. J.                          Grajeda v. Horel, et al.
                                                                      C 07-4752-PJH (PR)

requested that Plaintiff receive physical therapy sessions and have a non-metallic knee sleeve to strengthen his knee. (Kenny Decl. Ex. A, AGO-0060–0065.)

15. On June 22, RN J. Flowers examined Plaintiff. RN Flowers noted Plaintiff's complaint that the ferrous sulfate he took with meals was causing heartburn, he had acid reflux when lying down, and that he often rested his legs and feet elevated. RN Flowers informed Plaintiff that ferrous sulfate usually does not cause acid reflux, but that he should take ferrous sulfate between meals with juice or water, not with milk. RN Flowers also informed Plaintiff that elevating his legs may increase his headaches. RN Flowers also scheduled Plaintiff for a doctor's appointment. (*Id.* AGO-0067–0068.)

16. On July 11, Dr. Nguyen examined Plaintiff in preparation for an EDG and Colonoscopy. He diagnosed Plaintiff with anemia and a history of peptic ulcer disease. (*Id.* AGO-0073–0074.)

17. On July 19, I examined Plaintiff. Before examining him, I reviewed his medical records, including Dr. Nguyen's chart from his July 11 examination. Plaintiff wanted me to give him permission to wear a wool cap for another year, and reorder iron supplements and vitamin C. I reordered ferrous sulfate, Prilosec, and vitamin C. I stated that I would look into the knee sleeve and make sure the MAR committee considered Plaintiff's request to wear a wool cap for another year. I scheduled Plaintiff to return in thirty days to follow-up on physical therapy and the EDG and Colonoscopy. (*Id.* AGO-0075–0083.)

18. On August 3, I examined Plaintiff. Before the examination, I reviewed Plaintiff's medical records, including the July 25, 2006 iron-binding capacity test, which showed a decrease in Plaintiff's iron-binding capacity. He stated that his knee still hurt, he had not yet received the non-metallic right knee sleeve, had not received a wool cap, and he had diarrhea. I informed Plaintiff that a wool cap was not medically indicated. He stated that he would "take it up with Dr. Sayre." I rescheduled Plaintiff for follow-up in fourteen days for his complaints of diarrhea, and told him to tell medical staff if he continues to have problems. I advised him to avoid strenuous exercise, drink more water, and avoid alcohol and caffeine. (*Id.* AGO-0090–0095.)

//

5

19. On August 10, Dr. Sayre requested Plaintiff's temporary transfer to Sutter Community Hospital for an EDG and Colonoscopy. On August 14, Dr. Nguyen performed the EDG and Colonoscopy. Dr. Nguyen recommended that Plaintiff take Nexium once a day while awaiting the results of the biopsies. The same day, Dr. Williams ordered Prilosec for Plaintiff. (Kenny Decl. Ex. A, AGO-0098–0106.)

21. On August 21, I examined Plaintiff as a follow-up to the EDG and Colonoscopy. He stated that Prilosec hurt his stomach, so I discontinued it. Plaintiff also stated that medical staff may have seen Plaintiff's twin brother, not Plaintiff, walking without a cane, and that he wanted the cane back. I ordered Nexium per Dr. Nguyen's recommendation. Nexium is used to treat symptoms of gastro esophageal reflux disease (GERD) and other conditions involving excessive stomach acid, and is also used to heal the damage to the esophagus caused by stomach acid. I scheduled Plaintiff for follow-up in thirty days regarding the status of his anemia. I ordered Tylenol to address Plaintiff's complaints of pain. (*Id.* AGO-0112–0115.)

22. On August 30, I examined Plaintiff. Plaintiff stated that he had not yet received a knee brace and that he wanted a MRI of his knee. To address his complaints of diarrhea, I ordered fiber tablets. I also considered whether a bacterium was causing the diarrhea. Plaintiff stated that he felt much better since taking iron supplements, and I ordered comprehensive tests to measure Plaintiff's current iron levels. I rescheduled Plaintiff for follow-up in fourteen days regarding the diarrhea. (*Id.* AGO-0117–0119.)

23. On September 22, I examined Plaintiff to follow-up on his diarrhea. He stated that the fiber tablets helped with the diarrhea. He also stated that his back was stiff and his pain from the headaches was a four on a scale of one to ten. He complained that he was cold. I ordered Naprosyn to address Plaintiff's complaints of pain. Naprosyn is a non-steroidal anti-inflammatory drug (NSAID) commonly used for the reduction of moderate to severe pain, fever, inflammation, and stiffness caused by conditions such as osteoarthritis, rheumatoid arthritis, and degenerative disc disease. I gave Plaintiff permission to have an extra blanket. I directed medical staff to take Plaintiff's blood pressure once a week and to notify me if his blood pressure was

Decl. Risenhoover Supp. Defs.' Mot. Summ. J.            *Grajeda v. Horel, et al.*
                                                        C 07-4752-PJH (PR)

1 above 140 over 90. I advised Plaintiff to avoid caffeine and alcohol. (Kenny Decl. Ex. A, AGO-0131–0132.)

24. On October 2, I examined Plaintiff in response to inmate appeal PBSP-06-02193. Plaintiff stated that he had gone to physical therapy, but that it was for his right knee. He wanted physical therapy for his right hip. Plaintiff also stated that Naprosyn and Tylenol did not help. I discontinued the Naprosyn and ordered Salsalate. Salsalate is a NSAID effective in treating fever, pain, and inflammation in the body. Salsalate is also used for the treatment of inflammation and pain of soft tissue injuries, tendinitis, and other related arthritis conditions. I requested that the MAR committee review Plaintiff's requests for an MRI of his right knee and pain management changes. I rescheduled Plaintiff for follow-up in thirty days. (Kenny Decl. Ex. A, AGO-0134–0138.)

25. On October 13, the Pelican Bay radiologist analyzed an x-ray of Plaintiff's right hip taken on October 3. He concluded that there was only a mild degeneration of Plaintiff's arthritic condition since July 2004. (*Id.* AGO-0142.)

26. On October 20, I examined Plaintiff. He stated that his back had "popped" earlier but that the pain had subsided. He stated that Dr. Nguyen had not examined him since the EDG and Colonoscopy on August 14. I left a message with the Pelican Bay specialty clinic requesting that they schedule Plaintiff for a follow-up appointment with Dr. Nguyen. I reordered Salsalate and instructed Plaintiff to avoid strenuous exercise and recommended stretching and warm-ups before exercising. (*Id.* AGO-0143–0144.)

27. On November 13, I examined Plaintiff. He disagreed with the MAR committee's decisions that an MRI of his right knee, a wool cap, and a cane were not medically indicated. Plaintiff stated that he had a non-metallic knee sleeve. He reported that the diarrhea was gone. He stated that he no longer wanted to take Salsalate. Plaintiff stated that he would give me copies of orthopedic consultations performed while Plaintiff was at Corcoran State Prison. I discontinued the Salsalate and reordered the other prescriptions. I rescheduled Plaintiff for follow-up in 60 days. (*Id.* AGO-0154–0158.)

//

7

Decl. Risenhoover Supp. Defs.' Mot. Summ. J.    Grajeda v. Horel, et al.
C 07-4752-PJH (PR)

28. On December 22, I examined Plaintiff. He stated that his headaches were no better and his knee was getting worse. He stated that the other pain medications had not worked, but that he would still not take Elavil. I noted that test results indicated that Plaintiff's anemia had resolved. After the visit, I reviewed Plaintiff's case with Dr. Sayre, and he recommended that Plaintiff attend physical therapy sessions. I then submitted the request. (Kenny Decl. Ex. A, AGO-0172–0175.)

29. On January 24, 2007, I examined Plaintiff in response to an inmate appeal. He asked for an MRI of his right knee, right hip, and a Computerized Tomography (CT) scan to identify the cause of his headaches. A CT scan is a type of x-ray that uses a computer to interpret and display images. He claimed that his right hip was getting worse, and asked for a cane. He stated that he did not want pain medication because none of it worked. Later that day, I reviewed the orthopedic consultations performed while Plaintiff was at Corcoran. There was nothing in these consultations to indicate that I should alter Plaintiff's treatment plan. (*Id.* AGO-0177–0180.)

30. On February 28, I examined Plaintiff as a follow-up after his discharge from physical therapy on January 23 and my December 22 referral to the MAR committee. He stated that he did not want pain medication because it did not help. He stated that he needed the non-metallic knee sleeve. I explained that it was not medically indicated at this time. I rescheduled Plaintiff for follow-up in 30 days. I also ordered an x-ray taken of Plaintiff's right knee. (*Id.* AGO-0183–0185.)

31. On March 13, I examined Plaintiff as a follow-up to his x-ray and lab work. I informed him that the x-ray of his right knee did not reveal significant abnormalities. (*Id.* AGO-0193–0195.)

32. On March 30, I examined Plaintiff. I reviewed Plaintiff's case with Dr. Sayre the day before regarding Plaintiff's history of iron deficiency anemia. During the visit, Plaintiff complained that his right knee was swollen and that he felt stiff. He requested Tylenol and Ibuprofen. I ordered Tylenol and Ibuprofen. (*Id.* AGO-0204–0207.)

//

//

8

Decl. Risenhoover Supp. Defs.' Mot. Summ. J.     *Grajeda v. Horel, et al.*
C 07-4752-PJH (PR)

33. On April 20, I examined Plaintiff. Plaintiff requested an MRI of his right knee and right hip, a CT scan of his head, and Dr. Sayre's review of Plaintiff's "chart." He stated that his headaches were constant and that reading glasses did not help. I requested Plaintiff's referral to Dr. Cochrane, an Ophthalmologist, for Plaintiff's complaints of blurry vision. On April 24, the MAR approved my request. (Kenny Decl. Ex. A, AGO-0211–0214.)

34. On May 31, I examined Plaintiff. He stated that he had a bulging disc in his back, a tingling sensation in his spine, and that he was afraid of falling and hitting his head. He requested antacids and Prilosec to address upset stomach. I reordered Naprosyn to address Plaintiff's complaints of pain and discontinued the Ibuprofen at Plaintiff's request. I scheduled Plaintiff for an upper gastrointestinal examination (UGI). An UGI uses x-rays to diagnose problems in the upper gastrointestinal system—that is, the esophagus, the stomach and the first part of the small intestines. It can show blockages, abnormal growths, ulcers or other problems. I rescheduled Plaintiff for follow-up in thirty days regarding the ophthalmology consult and the UGI. (*Id.* AGO-0222–0225.)

35. On July 17, I examined Plaintiff. He stated that the ring finger on his right hand was swollen and painful. I ordered Neosporin and Erythromycin to address Plaintiff's finger injury. Neosporin is an antibiotic ointment used to prevent of infection and speed the healing of wounds. Erythromycin is used to treat many different types of infections caused by bacteria. I also reordered Naprosyn and Prilosec. I rescheduled Plaintiff for follow-up in fourteen days regarding the finger injury. (*Id.* AGO-0237–0242.)

36. On August 14, I examined Plaintiff. He stated that his finger had not improved. He also stated that the right side of his body hurt, and his right hip and back hurt whenever he walked for thirty minutes. I ordered an x-ray of his right hip and advised him to apply a warm compress to the finger. I rescheduled Plaintiff for follow-up once the lab x-rayed Plaintiff's right hip. (*Id.* AGO-0253–0257.)

37. On September 7, after reviewing the x-rays of Plaintiff's right hip with Dr. Sayre, I requested Plaintiff's referral to Dr. Duncan. Dr. Sayre and I also determined that Plaintiff did not need additional medical treatment for the finger injury. (*Id.* AGO-0262–0266.)

9

Decl. Risenhoover Supp. Defs.' Mot. Summ. J.    *Grajeda v. Horel, et al.*
C 07-4752-PJH (PR)

1  38.  On October 2, I examined Plaintiff to follow-up on the x-rays. I informed him that Dr. Duncan would see him and that Plaintiff did not need additional medical treatment for the finger injury. (Kenny Decl. Ex. A, AGO-0270–0273.)

39.  On October 17, Dr. Duncan examined Plaintiff. He determined that the arthritis in Plaintiff's right hip had increased somewhat, but recommended against surgery. He also recommended a cane and knee sleeve based on the arthritis. (*Id.* AGO-0280–0281.)

40.  On November 2, I examined Plaintiff. Prior to the examination, I spoke to Dr. Sayre regarding Dr. Duncan's recommendations. We noted that Plaintiff already had a knee sleeve, and Dr. Sayre gave Plaintiff permission to have a cane. (*Id.* AGO-0285–0287.)

41.  On November 15, I examined Plaintiff in response to an inmate appeal. He stated that he wanted to know what Dr. Duncan gave him for pain management, wanted to be seen by Dr. Duncan again, wanted an MRI of his head, wanted a wool cap for his head, and wanted extra pairs of thermal underwear. I referred Plaintiff's requests to the MAR committee for review. (*Id.* AGO-0296–0302, 0309, 0314–0315.)

42.  On November 27, the MAR committee reviewed Plaintiff's requests. The MAR committee denied the request for thermal underwear and wool caps because they were not medically indicated, denied the request for pain management through Dr. Duncan because NSAIDs are the appropriate treatment for Plaintiff's arthritis, and denied Plaintiff's request for an MRI of his brain because it was not medically indicated and because Plaintiff has a metal plate in his head. Because an MRI is by its nature magnetic, conducting one on a patient who has a metal plate in his head could cause serious injury, even death. (*Id.* AGO-0320.)

43.  On December 27, I examined Plaintiff. He complained of fatigue, again requested an MRI of his head, and stated that nothing was helping his headaches. I informed Plaintiff that his headaches could not be caused from the cold, because the metal plate in his head was the same temperature as the rest of his body. I reordered Tylenol for Plaintiff's complaints of pain and rescheduled Plaintiff for follow-up in thirty days regarding his complaints of fatigue. (*Id.* AGO-0328, 0332–0334.)

44.  At all times, my treatment of Plaintiff was within the California Department of

10

Decl. Risenhoover Supp. Defs.' Mot. Summ. J.                                   *Grajeda v. Horel, et al.*
                                                                                C 07-4752-PJH (PR)

1  Corrections and Rehabilitation's standard of care and was consistent with the degree of
2  knowledge and skill ordinarily possessed and exercised by members of my profession under
3  similar circumstances. I never denied Plaintiff treatment that was medically necessary or
4  medically warranted.

5      45.  Given Plaintiff's complaints and clinical presentation, my treatment of him was
6  proper. Plaintiff's complaints were not of an emergency nature, nor did he present with any
7  condition requiring treatment that was not provided. Plaintiff was appropriately treated for all his
8  medical complaints, and I never intentionally or deliberately delayed providing him medical
9  treatment. No medical provider, including myself, sought to cause Plaintiff medically
10 unnecessary injury, or undue pain and suffering. At all times, I was motivated by a genuine
11 concern for Plaintiff's health and well-being.

12     I declare under penalty of perjury that the forgoing is true and correct to the best of my
13 knowledge.

14     Executed on April 28, 2009, at Crescent City, California

                                            _S. Risenhoover_
                                            S. Risenhoover, CFNP

20 SF2008401032
   20192930.doc

11

Decl. Risenhoover Supp. Defs.' Mot. Sum. J.                    *Grajeda v. Horel, et al.*
                                                               C 07-4752-PJH (PR)